THE STATE OF FLORIDA AND THE TRUSTEES OF THE INTERNAL IMPROVEMENT FUND OF THE STATE OF FLORIDA, RESPONDENTS, VS. THE FLORIDA CENTRAL RAILROAD COMPANY, EDWARD M. L'ENGLE, ROBERT J. WASHINGTON AND FANNIE S. PAPY, EXECUTRIX OF THE LAST WILL AND TESTAMENT OF MARIANO D. PAPY, DECEASED, APPELLANTS.

1. The simple filing of letters testamentary after a final judgment against her testator does not enable an executrix to prosecute an appeal from the judgment. She must be made a party in the court below to give her a standing as an appellant in the court.

2. A person claiming to succeed to and represent the interests of a defendant against whom a judgment has been rendered, cannot, by simply filing a statement and exhibits showing such claim, prosecute an appeal to this court in his own name, there having been no action by the court rendering the judgment making him a party. The general rule is that a person has no right to appeal until some question to which he was a party has been adjudicated by the court of original jurisdiction.

3. A plaintiff may dismiss his own bill, with costs, at any time before decree. Where the order is to discontinue at "plaintiff's costs," it is the duty of the party to whom costs are awarded to furnish his bill or procure his costs to be taxed.

4. An individual stockholder cannot prosecute an appeal from a judgment against the corporation of which he is a member.

5. All power of a private corporation must be derived from some action of the Legislative Department of the Government. In order to the execution of a mortgage bond a railroad company must have been granted such power either in express words or by reasonable and necessary implication. In fixing the power of such corporation as to the character of the contracts it may make, it is proper to regard the general scope and purpose of the grant of the Legislature, and not to disregard entirely reasonable implications resulting from attendant circumstances. Under the legislation of this State the Florida Central Railroad Company had the power to execute a bond which was to be a mortgage by virtue of the statute, and without the execution of an additional mortgage to secure it. To such bond, when executed, attached the lien, power, and duty of the State as trustee under the statute.

6. Where an act within the power of a corporation is done irregularly, a subsequent confirmation and approval of the act by the stockholders

The State of Florida et al., v. The Florida Central R. R. Co. et al.

is sufficient to bind the corporation. A corporation having power to issue its bonds to another corporation for the purpose of enabling it to exchange them for bonds of the State, may ratify and affirm by subsequent action of its stockholders a former irregular issue and exchange of its bonds, done by officers or stockholders of the company.

7. Where a corporation is authorized to make a contract involving a trust and mortgage lien, and the statute confers a power of seizure and sale upon the trustee, the statute remedy is not exclusive. Such a statute creates rights and relations well known to equity, and its jurisdiction attaches.

8. The statutes fix the rights of the respective parties to such exchange. Under them the Florida Central Railroad Company was authorized to deliver its mortgage bonds to the Jacksonville, Pensacola and Mobile Railroad Company for the purpose of enabling the latter company, through an exchange of these bonds for State bonds, and a sale of the State bonds, to extend its line of road. The increased traffic which it was presumed would come to the Florida Central Company was the consideration for this contract. Upon an exchange of these bonds for State bonds the J. P. and M. Company cannot hold the bonds of the State as its own property, and without a sale of the bonds or an extension of the road occupy the position of a creditor of the Florida Central Company. It is not a bondholder within the meaning of the statute, or entitled to its protection.

Appeal from the Circuit Court of the Fourth Judicial Circuit for Duval county.

Justices Randall and VanValkenburgh being disqualified, Judges Bryson and Goss, of the Third and Fifth Circuits, with Mr. Justice Westcott, heard the case. The term of Judge Goss having expired, the court was composed of Mr. Justice Westcott and Judge Bryson when the opinion was delivered.

The opinion of the court contains a statement of the case.

*G. P. Raney* and *E. M. L'Engle* for Appellants.

*H. Bisbee, Jr.*, for Respondents.

WESTCOTT, J., delivered the opinion of the Court.

The appellants in this case looking to the assignment of errors and the parties named upon the calendar, are the

The State of Florida et al., v. The Florida Central R. R. Co. et al.

Florida Central Railroad Company, Edward M. L'Engle, Fannie S. Papy, executrix of the last will and testament of Mariano D. Papy, deceased, and Robert J. Washington. We consider the appeals in the order stated.

The plaintiff, the State of Florida, has in possession one thousand bonds of one thousand dollars each, bearing the seal of the Florida Central Railroad Company, of the following tenor and date:

"No. ——, $1,000, United States of America, State of Florida. Bond of the Florida Central Railroad Company.

"Know all men by these presents, that the Florida Central Railroad Company acknowledges itself indebted to the State of Florida in the sum of one thousand dollars for value received, which sum the Florida Central Railroad Company promises and agrees to pay to the State of Florida on the first day of January A. D. nineteen hundred, in the city of New York, with interest thereon at the rate of eight per centum per annum, payable semi-annually on the first days of July and January in each year, on the presentation and delivery of the proper coupons hereunto attached." This bond is one of a series of like tenor, limited to sixteen thousand dollars per mile, issued in accordance with an act of the Legislature of the State of Florida, approved January 28th, eighteen hundred and seventy, entitled an act to alter and amend "an act entitled an act to perfect the public works of the State," approved June 24th, eighteen hundred and sixty-nine, and given in exchange for bonds issued by the State of Florida to aid the Jacksonville, Pensacola and Mobile Railroad Company to complete, equip and maintain its road for an equal amount, in accordance with said act.

"In witness whereof the said company has caused this bond to be signed and attested in its behalf by its President, and the common seal affixed at its office in ——, this first day of January, in the year 1870.

"GEO. W. SWEPSON, President.

"H. H. THOMPSON, Treasurer."

To which bond is attached the coupons authorized by the statute hereinafter referred to.

This action was instituted by the State in March, 1872, to subject the property and franchises of this company to sale, the State alleging in its amended complaint, by which defendant was made a party, that the company had failed to pay any of the interest due upon the bonds. The defendant in argument denies that the allegations of the complaint set up an execution of these bonds by the company, and affirms that such allegation is necessary to sustain the decree. Without stating in detail all of the allegations in reference to this subject, scattered as they are through a complaint of twenty-eight printed pages, we will say that from a careful and accurate examination of all the statements of the complaint upon this subject, there is such an allegation, and that the complaint also states, substantially, a sale of the State bonds which were issued in exchange for the bonds of this company.

The plaintiff claims that upon this default it was lawful for the State, through the Governor, to enter upon and take possession of the property and franchises of the company, to sell the same and apply the proceeds in accordance with the provisions of the statutes under which it alleges the bonds were issued; and that this being a mortgage contract the remedy in equity attaching to such equitable relations was effective to decree a sale, and an application of the proceeds to the holders of the bonds of the State.

To this complaint the defendant in its original answer replied, not denying that the company was authorized to issue the bonds, or that they were delivered to the Governor of the State, and admitting the power of the company under the law to execute its bond; but after setting up the facts connected with the exchange, alleging that the exchange was made without its sanction or assent, the company, while not denying that it adopted these bonds as bonds of the company, alleged that when it did so *it was not aware of*

*the form of the bond,* or that it was to be exchanged with the State. It alleges, as a fact known to it, that an exchange of these company bonds for State bonds was made under an agreement between Milton S. Littlefield and Edward Houstoun, who together owned a large majority of stock in the company; that the exchange was made upon the understanding that the bonds received in exchange were placed in Houstoun's hands to secure amounts due him by Littlefield for the purchase of stock in the company, and for other sums due for other securities so purchased, as well as for payment for the stock in this company owned by other parties, it being understood that when this was done the bonds of the State should be delivered to Littlefield, who was the President of the Jacksonville, Pensacola and Mobile Rail Road Company. It was further agreed, between these parties thus owning nearly the entire stock of the company that Houstoun, if he so desired, might return the State bonds and receive the company bonds from the State; that the State bonds not answering the purposes of Houstoun, he did so return them, and received the company bonds in lieu thereof; that Houstoun then made a request of the directors to authorize, in lieu of the company bonds held by him, an issue of company bonds secured by a deed of trust, so that he might obtain the benefit of the aforesaid agreement between himself and Littlefield; that before this could be done two of the stockholders of this defendant filed a complaint, and obtained an injunction against the said Houstoun, restraining him from making any disposition of the bonds; that while this injunction was pending, C. B. Coddington, who was in the city of Tallahassee, in this State, representing S. W. Hopkins & Co., who claimed to be financial agents to sell said State bonds for the benefit of the Jacksonville, Pensacola and Mobile Railroad Company, made some arrangements with the plaintiffs in said injunction by which the injunction was waived, and at the request of said Coddington the said Houstoun authorized Robert H. Gamble, one of said

plaintiffs, and Comptroller of the State of Florida, in whose office he had deposited the said railroad bonds, to deliver the same to the said Coddington, which was done; and the said Coddington delivered the bonds issued by this defendant to the Governor, and obtained from him in exchange the State bonds which had been before issued by the Governor under the law to the Jacksonville, Pensacola and Mobile Railroad Company; and that it was in this way, and without any sanction or assent on the part of this defendant, the Governor got possession of the bonds of this defendant. The answer alleges further that the State of Florida had nothing whatever to do with the form and manner of the execution of said company bonds, and never made or insisted upon any requirements in connection therewith, and that the Governor "*was authorized by law to exchange bonds of the State of Florida for bonds of this defendant.*" The answer then affirms that said State bonds so delivered to Coddington, (before alleged to be the representative of S. W. Hopkins & Co., financial agents, *to sell* said bonds for the benefit of the J. P. & M. Co.,) have not been sold, and that said bonds are about to be returned to the State and the bonds of this defendant surrendered to it.

There was subsequently an amended complaint filed by the plaintiff, but as it was dismissed as to this defendant, its matter is not material. On the 26th of May, A. D. 1875, within two months of three years after the filing of the original answer and after a hearing upon an appeal in this court, there was filed what purported to be an amended answer of the Florida Central Company, in which it alleged that the resolution of the stockholders authorizing the issue of the one million of bonds was rescinded by a resolution of its directors, on the 21st of March, 1870. This resolution, which is made an exhibit, is to the effect that the bonds signed by G. W. Swepson as President, before that time *adopted*, could not be used to carry out the intention of their issue, (which, as we have seen, was to pay the stock-

holders for their stock,) and that the resolution authorizing their issue, be rescinded and the bonds be destroyed. The directors, then, by resolution authorized a new bond to be issued for the purposes of the company. This bond, it appears, was never issued, although its form was suggested. The amended answer alleged that at this time the State bonds were held by Edward Houstoun by agreement with the State of Florida and had not passed to the President of the Jacksonville, Pensacola and Mobile Company ; that he held them upon conditions to be performed before such delivery, and that such conditions were never performed. The answer, then, alleges that in conformity with this resolution the State bonds were returned to the State, and the bonds of this defendant were withdrawn from the State and were placed with said Houstoun to be returned to this defendant for cancellation, all of which was agreed to by and between this defendant and the State of Florida ; that subsequently, while these bonds were in the hands of said Houstoun for cancellation, they were by him, or some one acting for him, and without any authority or knowledge of this defendant, redelivered to the State of Florida. The amended answer then sets up that the purpose for which the company bond was issued and delivered to the State of Florida was in violation of its charter, and that said bonds are illegal and void- This answer then denies that any interest is due to the State of Florida on said pretended bonds, or that the bonds held by the State are a lien, and affirms that the State bonds are unconstitutional and void, and that the State has never paid any interest thereon, and has never been damnified by reason of its issuing said bonds. The rest of this answer is called a counter claim, but this was subsequently stricken out. There was a reply by the State to the counter claim, which, as a matter of course, went with it.

These pleadings show the issues between the parties. After evidence, there was a decree for the sale of the road, and from this decree this appeal by the company is taken.

The State of Florida et al., v. The Florida Central R. R. Co. et al.

What purports here to be an amended answer of the company was not signed by the President or any officer thereof, and was not under the seal of the company. It was signed by the attorney of the company and sworn to by one of the directors. The plaintiff insists that this was in no sense an answer of the company, and this is unquestionably true. The Supreme Court of the United States, in Bronson vs. LaCrosse Railroad Company, 2 Wall., 302, say, " a corporation must appear and answer not under oath, but under its common seal, and an omission thus to appear and answer according to the rules and practice of the court, entitles the complainants to enter an order that the bill be taken *pro confesso.*" (See, also, Aug. and Ames on Corp., 665.) The Code (and this is a Code case) provides that the verification to such answer may be made by any officer of the corporation, but the rule, so far as it requires that the answer shall be under seal, is not thereby changed. This, however, does not meet the question here presented. In this case, this paper was filed after an order of the court permitting the company to file an amended answer, and the plaintiff, so far as this record discloses, makes no motion to strike the paper from the files, nor does the State disregard it, but treats the paper as the answer of the company by replying to it. Under these circumstances, the plaintiff cannot perhaps be heard to object to it upon appeal on the ground of this irregularity. This matter, however, does not affect the conclusion we reach, for, with or without this amended answer, our conclusion is the same. Without deciding this question, therefore, we may consider the amended answer.

An analysis of these pleadings will show that there are four general questions presented for consideration. The evidence applicable to each of these questions will be stated as each question is considered.

First. Did the company have the legal power and authority to issue these bonds held by the State, and if it did have such power, were such bonds to be a first mortgage, with

the right in the State to seize and sell the road under the statute of 1870?

Second. If such power existed, were there such circumstances connected with the issue, delivery and exchange as excuse the company from their payment?

Third. Is there a remedy in equity as well as the particular remedy provided by the statutes?

Fourth. Are the bonds now held in such manner as to vest a right of action in the State to subject the road and property of the company to sale?

To the first question: This company is a private corporation, and all power which it possesses or can exercise must be derived from its charter, the amendments thereof, or from some action of the legislative department of the government granting such power, either in express words or by reasonable and necessary implication; and it is proper, in fixing the powers of a corporation, as to the character of the contracts it may make (the question here) to regard the general scope and purpose of the grant by the Legislature, and not to disregard entirely reasonable implications resulting from attending circumstances. This we regard as the rule established by a fair construction of the English and American cases—when the question is as to its power to execute a bond, mortgage or contract of like character, with third parties. Where the charter proposes to delegate a sovereign power to the corporation, the rule may be more strict on account of the difference in the nature of such power and a power to mortgage its own property and franchises for its own purposes. 1 Red. on Rail., 5th Ed., 253, and cases cited; Price on *Ultra Vires*, 87, 90, 91, 93, 140, 141; 3 Rob., 513; 3 Md., 305; 2 Dutcher, 221; 1 H. and M., 786; 1 Watts, 385; 6 Humph., 515; 11 Ala., 437; 28 Ala., 321; S. C. 33, L. J., Ch. 93.

The Pennsylvania cases upon this question which have been called to our attention seem to be inconsistent with themselves, and, therefore, one or the other of the inconsistent

views must be contrary to the general rule as deduced from other sources. Black, C. J., in the case of the Pennsylvania Railroad Company vs. Canal Commissioners (21 Penn. State, 22,) says : " Corporate powers can never be created by implication nor extended by construction ;" while in the case of Commonwealth vs. Erie and Northeast Railroad Company, (27 Penn. State, 351-2,) he says that the power must be given in plain words or by *necessary* implication. If there is any implication in the matter, it seems to me also that this necessarily involves construction, not indeed the liberal and broad construction to be given to a remedial statute, or the strict construction to be given to a penal statute, but a construction consistent with and following a reasonable view of the general scope and purpose of the legislative grant, viewed in the light of surrounding circumstances.

The Florida Central Railroad Company was incorporated in 1868, and was given all the powers and franchises before that time granted to the Florida, A. and G. C. Railroad, by an act approved January 7, 1853, with power to exercise the said powers and franchises *so far as they appertained to the railroad constructed from the city of Jacksonville, in Duval county, to Lake City, in Columbia county.* In addition to these powers, the act of 1868 gives it the express power to hold lands and tenements, goods and chattels that may be useful for the purposes of the road, and the same to *grant, mortgage* and dispose of. The fourteenth section of an act entitled " An act to perfect the public works of the State," approved June 24, 1869, authorized the Florida Central Company and the several companies owning the line of road between Quincy and Jacksonville to consolidate with the Jacksonville, Pensacola and Mobile Company, which was a company authorized to build a road from Quincy to Mobile. In the event of such consolidation, it authorized the Jacksonville, Pensacola and Mobile Company to raise money by way of mortgage of its property and franchises. It also authorized agreements looking to a common manage-

ment of these several roads without consolidation. The section then provided that the Jacksonville, Pensacola and Mobile Railroad Company, as to the road or roads, or parts of roads thus acquired, may · likewise issue coupon bonds or other evidences of debt, with coupons or otherwise, bearing such rate of interest and payable at such time and place and on such terms as the directors may determine, and to each are hereby granted the same privileges as are herein granted to the Jacksonville, Pensacola and Mobile Railroad Company.

Under this act the J. P. & M. Company was authorized to exchange bonds with the State to the extent of fourteen thousand dollars per mile, the State to have a statutory lien and mortgage upon its property and franchises to secure the payment of the company bonds, with power in the Governor, upon default in payment of principal or interest for sixty days, to take possession of and sell the road ; and this right was granted to "*each*" of the roads owning the line, by the latter portion of the section above quoted. While this section gave the Florida Central Company the same right as the J. P. & M. Company to issue its own bond or mortgage, still by an examination of the act it will be seen that it was deficient in that no method was provided by which the mortgage could be used for the great end and object of this legislation, which was the extension of this line of road to Mobile. No action was taken by the Florida Central Company under this act, and perhaps for the reason stated an act was passed on the 28th of January, 1870, amending the act of June 24th, 1869. This act was entitled " an act to alter and amend the act of June 24th, 1869." This act altered and amended the 4th, 9th, 11th, 12th and 20th sections of the previous act, leaving the *14th section which had given the Florida Central Company the same rights as were granted to the J. P. & M. Company in force, and also the 10th section of the act which authorized the J. P. & M. Company to deliver to the Governor of*

*the State coupon bonds of the company in exchange for State bonds.*

The sections of the act of 1869, thus changed and altered, embraced the 9th section, the section authorizing State aid to the amount of fourteen thousand dollars per mile to be given in exchange-for bonds to be delivered under the 10th section, as well as the section (the 11th section) defining the lien which would attach to the company bond in the hands of the State. In lieu of these sections the following provisions were substituted: Under the 9th section as altered the Governor of the State was directed to deliver to the President of the J. P. & M. R. R. Company, in order to aid the construction of its road westward from Quincy, " coupon bonds of the State to an amount equal to sixteen thousand dollars per mile for *the whole line of road and length of railroad owned by or belonging to said Jacksonville, Pensacola and Mobile Railroad Company, in exchange for first mortgage bonds* of said railroad company, of the denomination of one thousand dollars, when the President thereof shall certify upon his oath that the road or parts of road for which he asks for an exchange of bonds is completed, and is in good running order. The said bonds shall be of the denomination of one thousand dollars, signed by the Governor, countersigned by the Treasurer, sealed with the great seal of the State. They shall bear eight per cent. interest, payable semi-annually, and shall be payable to bearer. They shall be dated on the first day of January, A. D. 1870, and shall be due thirty years thereafter, and principal and interest shall be payable at such place in the city of New York as the Governor shall designate. The coupons for interest shall be payable to bearer, and shall be authenticated by the written or engraved signature of the Treasurer; *Provided, however*, that whenever the Jacksonville, Pensacola and Mobile Railroad Company shall or may determine to pay the interest in gold, for or upon their bonds or the bonds designated in

the tenth section of an act entitled ' an act to perfect the public works of the State,' approved June 24th, 1869, upon giving notice to the Governor of such intention, then the State bonds aforesaid and the coupons for interest on said bonds, shall be payable in gold, notice of which shall be given by the Governor in some paper published in the city of New York, and at the capital of this State, to be designated by the Governor."

The tenth section remained as in the original act.

The eleventh section was altered and amended so as to read as follows : " To secure the principal and interest of the said company bonds, the State of Florida shall, by this act, have a statutory lien, which shall be valid to all intents and purposes as a first mortgage duly registered on the part of the road for which the State bonds were delivered, and on all the property of the company, real and personal, appertaining to that part of the line which it may now have or may hereafter acquire, together with all the rights, franchises and powers thereto belonging, and in case of failure of the company to pay either the principal or interest of its bonds or any part thereof for twelve months after the same shall become due, it shall be lawful for the Governor to enter upon and take possession of said property and franchises, and sell the same at public auction, after having first given ninety days' notice by public advertisement in at least one newspaper published in each of the following places : The city of New York in the State of New York, the city of Savannah in the State of Georgia, and the city of Tallahassee in the State of Florida, for lawful money of the United States, and for nothing else, except that the State for its own protection may become the purchaser at said sale, and may pay on said purchase any evidences of indebtedness the State may hold against said roads, which purchase money or said evidences of indebtedness shall be paid on the day of sale into the treasury of this State, or within ten days thereafter ; and all moneys arising from said sale and paid

The State of Florida et al., v. The Florida Central R. R. Co. et al.

into the treasury of this State, as heretofore prescribed, shall be promptly and exclusively applied to the payment and satisfaction of the bonds issued by the State of Florida under this act, and in case the holders of said bonds do not present them for redemption within ninety days after said sale, the Treasurer shall invest the same, or any part thereof which may be remaining in his hands, in the securities of the United States, to be held by the State of Florida, as trustee for the bondholders, until said bondholders shall demand the same, upon which demand the Treasurer shall immediately turn over or pay said securities to the bondholders. The purchaser or purchasers of said road shall be by said sale possessed of all the rights, privileges and franchises of said defaulting company, together with the franchise of use and being a body politic, and the Governor shall, upon the payment of the said purchase money into the treasury of this State as above provided, immediately cause the purchaser or purchasers of said road at said sale to be placed in the actual possession, use and enjoyment thereof, and cause all the books, papers and real and personal property of said company, of every description, together with its franchise of use and being a body politic and corporate, to be turned over to said purchaser or purchasers, and the purchaser or purchasers of said road shall be by said sale possessed of all the rights, privileges and franchises of said defaulting company, together with the franchise of use and being a body politic and corporate, and may use any new corporate name they see fit, and make and use a new seal upon signifying their action in writing to the Governor, and thereafter may exercise all the rights of a body corporate and privileges thereof, and of said defaulting company, under said new name, for the term of thirty-five years to date, from the time of the purchase as aforesaid; that any such sale shall be ratisfied by the Legislature before the same shall become effective."

With this history of this legislation and this statement of

the provisions of the original act as it stands altered and amended, we reach the additional section of the amendatory act under which it is claimed that the Florida Central Railroad Company had full authority to issue the bonds upon which suit is here brought. This section, (the fourth section of the amended act,) provides that the Governor shall, for the purpose of further aiding said Jacksonville, Pensacola and Mobile Railroad Company in the speedy construction of its road, deliver to the president of said company coupon bonds of this State of the same character as those above described in this act, to the amount of sixteen thousand dollars per mile, upon receiving for and from the President of said company first mortgage bonds of like amount on any part or portion of the road between Quincy and Jacksonville; *Provided, however,* The State bonds under this section shall not be exchanged for first mortgage bonds for a greater length than one hundred miles of any part of railroad between Quincy and Jacksonville, provided the said railroad *company* or *companies* shall not issue first mortgage bonds to a greater amount than sixteen thousand dollars per mile.

It is plain and clear *from the letter* of this act as amended that unless the exchange provided for under this section is an exchange of bonds *on a line of road other than that owned by the Jacksonville, Pensacola and Mobile Company,* that it is mere surplusage, useless unnecessary and of no effect. The ninth section of the act as amended directed the Governor to exchange bonds with the President of the Jacksonville, Pensacola and Mobile Company *for the whole line of road and length of railroad owned by or belonging to the Jacksonville, Pensacola and Mobile Railroad Company.* Now the exchange thus authorized with the Jacksonville, Pensacola and Mobile Company embraced, as is shown by the pleadings, the line of road extending from Quincy to Lake City; and the other part of the road between Quincy and Jacksonville, to-wit: from Lake City to Jack-

sonville, was all of this line of road that was left upon which an exchange could be had. This was all owned by the Florida Central Railroad Company, and hence the section was of no effect, unless it applied to this company. This construction not only makes the section of no effect, but such construction is inconsistent with a proper view of the other part of the section itself. The first proviso limiting the amount of bonds to be issued under *this section* shows that it was to be an additional issue to that authorized by the ninth section; and the second proviso, using the words, " company or companies," in the connection in which they occur, construed with reference to the fact that the Jacksonville, Pensacola and Mobile Company had been given, under another section, full authority to exchange for its whole line of road, shows clearly that some company other than it was granted authority under this section. This being so, the only company to which this section could apply was the Florida Central Railroad Company. It is not necessary that the statute should use in express terms the name of the Florida Central Railroad Company in conferring this power to issue first mortgage bonds. It is enough, if, by necessary implication, it has the power. The connection between two railroads is an act which requires the concurrence of both; and yet, when a statute authorizes one company to connect with another, the authority is necessarily conferred upon both. So here, where the law authorizes the State to receive from the Jacksonville, Pensacola and Mobile Company bonds upon a line of road not owned by itself, and restricts the company or companies as to the amount they may issue, the power is necessarily granted to those companies to issue the bonds to the extent of the limitation. This is a case similar to that of a clearly implied power, resulting by necessary deduction from the purview of an act of parliament. The joint-stock companies' act of 1844 (7 and 8 Vict. C. 110) having, in Section 45, laid down certain regulations as to the mode in which bills should be

accepted, &c., on behalf of companies coming within this statute, it was assumed by the English courts as a matter of course that such companies thereby acquired the power to issue bills and notes.  Halford vs. Cameron, &c., Railway Company, 16 Q. B., 442; 20 L. J. (Q. B.,) 160; Aggs vs. Nicholson, 1 H. and N., 165; 25 L. J., (Ex.,) 348.  This case is much stronger than the English cases.  They are cited simply to show the extent to which these courts have gone in the matter of implied powers.  This conclusion is also consistent with the general purpose, scope and intent of all this legislation, futile though it may have been to accomplish the end desired.  That purpose was to extend the line of railway from Quincy to Mobile.

The Jacksonville, Pensacola and Mobile Railroad Company owned the line of road from Quincy to Lake City, where it connected with the road of the Florida Central Company, whose road extended from Lake City to Jacksonville, and the Florida Central Company was given the opportunity, by this legislative action, of aiding in the extension of this connected line (from Lake City to Quincy) to Mobile, thus bringing its own road and the road of the Jacksonville, Pensacola and Mobile Railroad Company in connection with the roads radiating from that point.

This legislation, therefore, gives this company authority to issue " first mortgage bonds;" and the next question is, whether it authorized a bond and accompanying mortgage to be executed in a formal manner by the company, or whether the bond which, under this statute, is called " a first mortgage bond," and to which the statutory lien and remedy attaches, is the bond referred to.

This section of the statute does not, in terms, authorize a bond and a separate mortgage to secure its payment. It, in terms, authorizes a "first mortgage bond."  The terms, "first mortgage," qualify the term " bond," and the necessary result is that it means a bond that is to be a first mortgage without such additional formalities of executing a

mortgage, if such a thing is provided for in the act, and such construction is consistent with the other portions of the act. This is a strict construction, and we think the proper one.

Now, the bond which the Jacksonville, Pensacola and Mobile Company was authorized to issue was a simple bond, which was, under the statute, to be a "first mortgage bond," with a lien of the character defined in the act. No additional mortgage was to be executed to make it effective. In the section of the act making this amendment, the bonds, which the Jacksonville, Pensacola and Mobile Company were authorized to issue, were denominated "first mortgage bonds," the same terms used when this authority is granted the Florida Central Railroad Company. The bond which the Jacksonville, Pensacola and Mobile Company was to issue was a simple bond under the tenth section of the act, and by other sections of the act it is declared a "first mortgage bond," with the statutory lien and remedy incident thereto. In addition to this, the section authorizing the Governor to enter upon, take possession of and sell the property to which the lien attaches, provides that the State, at such sale, "for its own protection, may become the purchaser at such sale, and may pay on said purchase any evidences of indebtedness the State may hold against said *roads*." If it was to have this lien only as to one road, the use of the term *roads*, instead of *road*, cannot be explained. If it has it as to two, it is all consistent, and if there is more than one, the other must be the Florida Central Railroad, as it and the Jacksonville, Pensacola and Mobile Railroad are the only two to which the term can apply, as they are the only roads which are authorized, under the act as altered and amended, to issue "first mortgage bonds." The necessary conclusion, we think, is that the first mortgage bond intended was the bond authorized by the tenth section of the original act, and to it in the hands of the State attached the lien and remedial rights provided in the act for its enforcement.

The company here has issued a bond under the tenth section of this act, and its acts have been in accordance with the law as construed by itself. A dissenting stockholder may well resist the company, or even its creditors, in enforcing claims of this character ; but where the company has accepted the act and executed its bond, a plea of a want of authority while it must be sustained in all cases where it is good, yet in the language of Lord St. Leonards, "one cannot but lament to see great companies like this, with an attorney always at its command, with every means of consulting counsel daily, if it thinks proper, entering into a contract with a full knowledge of all their powers, and with legal advice constantly at command, turning round upon the party with whom they have contracted, and endeavoring to evade the contract upon the ground that the contract they entered into is beyond their powers, and absolutely illegal on the face of it. One cannot but regret that these companies should resort to so unseemly a defence in courts of justice." 15 Eng. Law and Eq. 367.

We now reach the second general question. Were there such circumstances connected with the issue, delivery and exchange of these bonds as excuse the company from their payment ? The allegation in the amended answer of this company to the effect that a resolution was passed rescinding the resolution which authorized the issue of the bonds signed by Geo. W. Swepson, as President, (the bonds now sued upon), and directing their destruction, was passed as stated, but the resolution was never carried out and the bonds were not destroyed. It is hardly necessary to say that a debtor cannot destroy his obligation by resolutions of this character unexecuted. It is true as alleged in the amended answer, that Houstoun returned the bonds of the State to the State, after their first issue, and received the company bonds in return ; but it is not true that the bonds, with any assent of the State or of Houstoun were in his hands, to be returned for cancellation, or that there was any agreement

on the part of the State of Florida that they should be cancelled. Houstoun retained the State bonds, and as the first answer admits, until Littlefield paid him certain debts. He received these bonds under his contract, which was that instead of selling the State bonds he might return them and take back the company bonds; and he was to hold them until other bonds of the company were delivered to him. Instead of doing this Houstoun delivered the company bonds to Coddington, and the State delivered its bonds in exchange to him. Now it may be that, under some circumstances, the want of an express assent by the company to these acts might be of some avail as against parties not *bona fide* holders for value of these bonds, but that question does not arise here, and we desire to express no opinion upon the subject. In addition to this, too, it must be remembered that Littlefield and Houstoun, who together represented a very large majority of this stock, and to whose wishes the company seems in all its acts to have yielded assent, agreed to this exchange, and made no objection. But, however, all this may be, the allegations of the original answer, so far as it states facts, may be admitted; and the allegations in the amended answer may be admitted to the extent they are sustained by the evidence as above shown, and there is but little in these allegations when viewed in the light of the subsequent action of the stockholders of this company.

On the 13th of May, A. D. 1871, after the company had failed to destroy its bonds as its directory had resolved, and after Coddington had made the exchange with the State, with the assent of Houstoun and Littlefield, Mr. Houstoun offered the following resolution at a meeting of the *stockholders:*

"*Resolved,* That Edward Houstoun do place the bonds referred to in the preamble and resolutions of the stockholders, adopted June 20th, 1870, in the hands of S. W. Hopkins & Co., for the purpose mentioned in said resolutions, subject

to the same exceptions as therein expressed with respect to the proportion thereof applicable to the stock owned by other parties, and according to the same terms therein mentioned."

The resolution was adopted. The bonds here referred to are the bonds now held by the State. So far as the exchange of these bonds by the company is concerned, here is its express authority given for it, and that must be an end of this matter.

We now reach the third general question. Is there a remedy in equity as well as through the exercise of the power of sale given the trustee under the statute?

It is insisted that these statutes give a new right and prescribe a particular remedy not known to the common law, and that such remedy must be strictly pursued, and is exclusive of every other.

The power of this corporation to make this particular first mortgage bond, and by its act create the trust, must result from legislative grant, as the corporation has not, like an individual, a general power to contract except where there is a limitation. But when a power granted by the Legislature to a corporation is exercised, and it results in a contract which the statute makes a mortgage, and to which it attaches a trust, it is as if the same power was exercised by an individual so far as the mere act of making the contract is concerned. It is true that neither a court of equity nor law can, as a general rule, aid the defective execution of a statutory power, because the mannner of the exercise of the power is a matter of public policy; but if a contract is made and executed by virtue of a statute, (the only way in which a corporation can contract), and that contract is a mortgage or involves a trust, there is a relation and right created which is well known to equity.

If there is a trust and mortgage, and connected with them in order to their due enforcement there is a statutory power of sale, cannot a court of equity at the suit of the trustee

decree a sale conformably to the statutory power? We cannot see that the Legislature in authorizing a corporation to execute a mortgage bond to have a statutory lien of defined character with a power of sale in a trustee named, is a statute giving a new right within the meaning of the authorities upon that subject. The cases reported in 1 Michigan, 200; 3 Mass. 310; 5 John. 174; and 5 Mass. 515, are clearly distinguishable from this. A statement of the case reported in 5th Mass., in which the opinion is delivered by Mr. Chief Justice Parsons, will show the clear distinction between this case and the class of cases sustaining the view maintained by the company here. "By the statute of 1874, c. 66, § 1," says Chief Justice Parsons, "every person convicted of larceny might be punished by a fine not exceeding one hundred pounds, or by whipping not exceeding thirty-nine stripes. And the third section provided that besides the said punishment he should be sentenced to forfeit to the owner treble the value of the goods stolen, deducting the value of such of them as might be returned; and if the offender should be unable to pay the same he might be further sentenced to make satisfaction by service to the owner, who was empowered to dispose of him in service for such time as the court might assign. But it was enacted in the tenth section that unless the owner shall sell him in service within thirty days, or give to the gaoler security to pay the charges of keeping the convict in prison, the gaoler may set him at liberty, the prisoner paying him the prison charges.

"When a statute creates a new right without prescribing a remedy, the common law will furnish an adequate remedy to give effect to the statute right. But when a statute has created a new right, and has also prescribed a remedy for the enjoyment of the right, he who claims the right must pursue the statute remedy.

"In the case before us the right claimed by the plaintiff to receive the treble damages is given by the statute which

also prescribes his remedy. Upon the sentence the defendant was in execution. If able to pay his body was a pledge to the plaintiff; if unable the plaintiff might dispose of him in service for nine months. This disposition he was not obliged to make within thirty days if he would secure the prison charges to the gaoler. On giving security he might retain the body as a pledge until payment.

"But he wholly neglected his remedy. The defendant not being able to pay, the plaintiff did not dispose of him nor retain the body by giving security. The defendant was afterwards lawfully discharged, and the plaintiff has now no remedy."

Now here was certainly a new right and new penalties. If the right is new, then as remarked by Chief Justice Parsons, "the common law will furnish an adequate remedy to give effect to the statute right." But if the rights and relations created are known, then there will be known remedies. We think that the power of a court of equity attaches in this case and that the remedy prescribed by the statute is not exclusive.

The court of equity, however, should follow the law giving the right in its decree as to time of sale and appropriation of trust funds, and we think the franchise to be a corporation will pass, as it is covered by the lien as defined by the statute. 2 Chand. 103; 1 Wis. 432; 55 Penn. State, 204; 8 Ala. 694; 15 Texas, 269.

In this case equities were claimed by the trustees of the Internal Improvement fund by which they insisted they had rights paramount to those of the State or the bondholders, and in most cases of this character there are differences to be settled which necessarily call into action the plastic and extensive powers of a court of equity in the matter of mortgages and trusts. This is a trust coupled with a mortgage and power of sale. 3 John. Ch'y 344; 2 Met. 252.

Having determined that there was power in the company under the statutes to issue these bonds, and having deter-

mined also that the last action of the stockholders approving, their issue for purposes of exchange is binding and effective upon the company, notwithstanding the previous unexecuted order of its directory to destroy them, and that there is a remedy in equity under the mortgage and trust, the next question is whether under the present status of these bonds, as disclosed by the testimony, any cause of action has accrued to the State as trustee. The State insists that Littlefield's testimony is "that the four million of bonds were sold on November 14th, 1870, but the J. P. & M. Company could not deliver the one million of bonds received from defendants until the stock in the Florida Central Company was paid for. Stockholders of defendant company trusted Houstoun to hold bonds until stock was paid for. Houstoun delivered them to S. W. Hopkins & Co., to their agent, Coddington, upon his promise to pay for stock. (*Vide* exhibits H, J, K, L, M, and N.) Of course this delivery was in satisfaction of the contract of sale of 14th of November, 1870. The deed of trust (exhibit R,) shows that not only have the State bonds received for defendants' bonds been sold by the J. P. & M. R. R. Co., but that they are in Europe, and said company made provision in said deed of trust to pay interest to the State on account thereof; and further, the testimony shows that S. W. Hopkins & Co. made advances on the very bonds before they were sent to Europe, and paid Houstoun for his stock and P. & G. R. R. bonds. Hopkins & Co. also accepted draft for $227,000 to pay debt of J. P. & M. Company, due Board of Trustees, which, if not paid, they are now liable to pay.

The Florida Central Company insists that the State bonds delivered to Coddington by the Governor for its bonds have not been sold, and that said bonds are about to be returned to the State, and the bonds of the company returned to it. This is a material issue involving a consideration of the evidence, and we proceed to examine all of it having reference to the subject.

The testimony of Chas. H. Foster is not material in the consideration of this subject. What he says relates to matters other than the present status of the State bonds.

Harrison Reed, who was Governor of the State at the time of the exchange, says little that has any bearing upon the subject. He states that about the time of the exchange he was given a draft of $227,000 by the President of the J. P. & M. Company upon S. W. Hopkins & Co. Upon the draft acceptance was waived, and no acceptance was shown. There was nothing but an unaccepted draft of Littlefield. This witness further says that Coddington was the agent of the State to see that this draft was paid from the proceeds of sale of the one million of bonds, but no contract pledging the bonds or their proceeds in that way for this sum is shown upon the part of any person. This witness states further *that the draft was never paid*, and no report was ever made to him *as to the disposition of the bonds or their proceeds*. This witness mentions some receipt of Coddington given to him, but it is evident that the receipt referred to was a receipt given by Coddington to Houston, to which we will refer hereafter. If it was not this receipt, then its nature is not disclosed.

M. S. Littlefield's testimony covers the matter of the issue of the bonds, and relates to the nature of contracts between himself, Houstoun and others, to which we hereafter refer as exhibits. He states that the stock he purchased of Houstoun was paid for about the 13th April, A. D. 1871, by S. W. Hopkins & Co., the fiscal agents of the J. P. & M. R. R. Company in New York and London. The witness then states that the J. P. & M. R. R. Company closed a contract with S. W. Hopkins & Co. *to sell* the four millions of State bonds on the date of a letter in evidence, which is one of the exhibits hereafter referred to. That John Collinson, a civil engineer and broker, residing in England, was the man with whom Messrs. Hopkins & Co " *contracted to sell* " said bonds for the J. P. & M. Co. That C. L. Chase went to

Europe to negotiate the bonds of the company and to return to the State the State bonds. That in *November, A. D. 1870, when the company offered the State bonds for sale to S. W. Hopkins & Co., it did not have the control of but three millions of said bonds. When the agreements were carried out between Houstoun, Sanderson and himself, the other million of State bonds would be controlled by the company. There were separate agreements between Houstoun and himself to be carried out before the last million of State bonds could be controlled by the J. P. & M. Company.*

This testimony does not establish a sale of these bonds, nor does it show that any advances were made upon them. It shows that at the time of the *offer to sell* the four million to S. W. Hopkins & Co. the J. P. & M. Co. controlled only three million, and that certain agreements between this witness and the two parties, Houstoun and Sanderson, were to be carried out, and then the J. P. & M. Company might control the bonds. There is no evidence here that the contract to sell the one million bonds of this company to any person was ever carried out, or that there was any sale or pledge of the bonds. The naked declaration of the witness that Houstoun was paid by S. W. Hopkins & Co., the financial agents of the J. P. & M. Co., does not prove a sale of these particular bonds. They had other securities of the J. P. & M. Co. in their hands, and besides, Littlefield, as we shall presently see, swears positively that these bonds are not sold. So far, therefore, as Littlefield's testimony is concerned, it does not show that these bonds are now in the hands of a purchaser, or that they are held as security for any advances.

We come now to an examination of the exhibits which the State relies upon. Plaintiff claims that exhibits H, I, K, L, M, and N, have an important bearing on this question. Exhibit H does not even mention these bonds. Exhibit I is an agreement between M. S. Littlefield and Houstoun, which does not even mention the State bonds. Exhibit K is an

agreement between Littlefield and Houstoun, by which Houstoun was to hold the one million of the bonds of the State, authorized to be exchanged under the act, to secure him in the payment of an unaccepted draft of Littlefield to him upon S. W. Hopkins & Co. for $163,026.70, bearing date May 13th, 1870. After payment of this draft and expenses of sale of bonds, the balance was to be applied to other debts therein named. Under this agreement Houstoun had the option, upon the maturity of the note, of returning the State bonds and receiving in lieu thereof the one million dollars first mortgage bonds of the company. *The evidence shows, and it is admitted, that he did return the State bonds and received the company bonds.* This exhibit clearly does not prove a sale.

Exhibit L is a receipt given by Coddington, the agent of S. W. Hopkins & Co. for this one million bonds of the Florida Central Company. In this receipt he declares that he holds these bonds in trust for Houstoun, to pay him other sums for other parties named. The arrangement, however, was "based on the assumption that the money would be paid from the proceeds of bonds negotiated by S. W. Hopkins & Co., of New York." The remainder of said proceeds was to be disposed of as directed by the parties interested. These company bonds Coddington exchanged for State bonds. The other evidence shows this, and hence we must look elsewhere than to this exhibit to trace the bonds of the State.

While Coddington contracted to hold the company bonds in trust, he in fact exchanged them for State bonds. These he received as the agent of S. W. Hopkins & Co., who were fiscal agents of the J. P. & M. Co. It cannot be said that the receipt shows either a pledge or sale of these particular State bonds. This receipt of Coddington is dated the 11th January, 1871. The next thing in the case stated having reference to the locality and status of the one million of State bonds is a receipt (marked exhibit M) of S. W. Hop-

kins & Co., given to Littlefield on the 15th April, 1871, for an order upon E. Houstoun for the delivery of certain Florida Central Railroad stock and bonds of the Pensacola & Georgia and Tallahassee Railroad Companies, held by Houstoun, upon their payment to Houstoun of $163,026 70, S. W. Hopkins & Co. agreeing to hold these securities as collaterals for the payment of this sum, as well as for any *subsequent advances that may be made by them* against the one million of bonds formerly held by Mr. Houstoun, until sufficient money shall be realized from the sale of said million of bonds to reimburse them for said advances, or until the bonds shall be taken from market and returned to the State, and some mutually agreed upon plan between said Littlefield and themselves adopted to reimburse them, or by issue, of railroad bonds, land floats, or any other securities deemed expedient. In this receipt for the order of Littlefield upon Houstoun, S. W. Hopkins & Co. agree to hold the securities mentioned as collateral for payment of the sum of $163,026.70, as well as for any "*subsequent advances that may be made*" against the one million of bonds, until sufficient money may be realized from the sale of said million of bonds formerly held by Mr. Houston, and it was agreed that they might "take the bonds from market and return them to the State." When it is remembered that this firm were the agents of the J. P. & M. Co., who had their bonds in hand to sell them, the amount of this paper is simply that in the event they made advances against the one million they might pay themselves from the proceeds of sale. It does not prove that they have made such advances, or that the bonds have been sold. It establishes that these bonds are in their hands for sale or to secure advances that "*may be made*."

Exhibit N, to which importance is given by the plaintiff, is a letter of M. S. Littlefield to S. W. Hopkins & Co., offering to sell them the entire four million bonds authorized to be issued by the State. It is as follows:

58 OLD BROAD STREET, LONDON, Nov. 14, 1870.
MESSRS. S. W. HOPKINS & Co., LONDON:

*Gentlemen:* I herewith offer you 4,000 Florida State 8 per cent gold bonds in aid of the Jacksonville, Pensacola and Mobile Railroad Company for one thousand ($1,000) dollars gold each, at the price of one hundred (£100) pounds sterling for each bond in the city of London, subject to the commission agreed as per contract dated 13th day of April, 1870, with your good selves.

I remain, gentlemen, yours faithfully,

M. S. LITTLEFIELD,

J. P. & M. R. R. Co.

This is nothing more than an offer to sell these bonds, made a year before they were delivered to Coddington. There is nothing to show that S. W. Hopkins & Co. made such a purchase or took the bonds on these terms, or that they now hold this one million for any advances, or that any person has either paid or advanced money on these bonds to the J. P. & M. Co. This receipt to Littlefield, dated April 15, 1871, long after this letter in which they speak of *subsequent advances that may be made by them,* shows that there was no sale to them.

Exhibit O is a resolution of the stockholders of the Florida Central Company, passed May 13, 1871, authorizing E. Houstoun to place the bonds referred to in the preamble and resolutions of the stockholders of the company, adopted June 2, 1870, in the hands of S. W. Hopkins & Co. for the purpose mentioned in said resolution, subject to the same exceptions as therein expressed with respect to the proportion thereof applicable to the stock owned by other parties and according to the terms therein mentioned. This resolution, as a matter of course, does not show the present locality of the State bonds. Exhibit M, as we have before seen, shows the condition of the bonds, long after this resolution, in the hands of S. W. Hopkins & Co., and it is unnecessary to repeat here what has been said in that concention.

The plaintiff insists that exhibit R, which is a deed of trust executed by the President of the J. P. & M. R. R. Co. to D. G. Ambler, F. H. Flagg and C. L. Chase, on the 2d of October, 1871, shows the sale of these bonds by the J. P. & M. Co. The President of this company, by their deed, in consideration of a contract by the Florida Construction Company to construct the road westward from Quincy to Mobile, conveyed to the parties named in trust for the period of two years the rolling stock and equipments, &c., of the road, as well as the franchises incident and necessary for the operation of the road. While we think that the recitals in such a deed are not evidence against the Florida Central Railroad Company, an entire stranger to the instrument, (and indeed this objection is applicable to many of these exhibits,) yet these recitals do not show a sale of the one million of bonds, when construed with the testimony of Chase, one of the trustees named in the deed, and Collinson and Coddington. To this testimony we refer subsequently, and here only examine these recitals. The deed recites that the Jacksonville, Pensacola and Mobile Company has received from the State of Florida certain bonds; that this company is responsible for the payment of the interest on these bonds, and makes it the duty of the trustees to pay this interest under certain circumstances. The party of the first part transfers the proceeds arising from the negotiation and sale of the before-mentioned bonds yet to be received, and which are now on deposit in London, to the receipt whereof the authority of John Collinson, of London, is necessary to be obtained; and such balance of the proceeds of the sale of the remainder of the said sum of four millions of bonds as remains unapplied by the party of the first part at the date of the execution of the deed. In the payment of the liabilities which these trustees assumed, the deed provided "that they shall be limited and restrained to the proceeds of the sale of such of the aforesaid four millions of dollars of the bonds of the State of Florida as may come to

their hands, exclusive of the said $1,200,000, *now on deposit in London, which said* $1,200,000 *of bonds shall be* applied exclusively to the completion of said railroad." The deed further provides that nothing in the contract shall be construed to interfere or conflict with any contract or arrangement that has heretofore been made with John Collinson or Aaron Barnett, or their associates, for the sale or negotiation of bonds that may have been or may hereafter be issued.

The several recitals in this deed must be construed together and made consistent. The general power as to the contract for the proceeds of *four millions* of bonds, is afterwards limited, and in this limitation $1,200,000 of these bonds are stated to be on deposit in London, and these parties contract to apply these $1,200,000 of bonds to the completion of the road, at the same time agreeing not to interfere with any contract or arrangement for the sale or negotiation of bonds made with Collinson or Barnett. A fair construction of these recitals shows that $1,200,000 of the four million of bonds are on deposit in London, and we are by this contract left in doubt as to whether the one million of bonds then on deposit are not the bonds of the State exchanged with the Jacksonville, Pensacola and Mobile Company for the bonds of the Florida Central Company, which are the bonds out of which the rights and equities claimed in this suit by the State arise. This question is settled by an admission of the State through its attorney placed on record that the Florida Central Railroad Company could prove by *John Collinson that the bonds of the State issued for the Florida Central Road have never been sold, and that nothing has been paid by the State on said State bonds and coupons;* and by a like admission of the attorney of the State *that C. L. Chase, who was one of the trustees in this deed, could prove that he was in London in 1873; that he went there to get the State bonds back and found they had not been sold; that he was defeated by the action of the State in this suit from receiving the return of the State bonds; and*

*the State bonds had not been sold at the commencement of this suit. The attorney of the State consented not only that the Florida Central Company could prove these facts, but also that the statements containing these facts should have the same force and effect, as testimony, as if said statements were depositions duly taken by commission from court.*

All of this is established by the following admission and agreement of counsel, which we find in the record:

"State and Trustees vs. Jacksonville, Pensacola and Mobile Railroad Company and others—Duval Circuit Court.

"Defendant, Florida Central Central Railroad Company, can prove by T. B. Coddington that the bonds of the Florida Central Railroad Company were delivered by him to the State of Florida and he received the bonds of the State; that the transaction was secret, and to avoid legal interruption of the same, he took a carriage and proceeded beyond the limits of Florida; that all this was done without the knowledge or consent of this company; that he received the one million of Florida bonds from the State as the agent of the State, and after the Florida Central Railroad Company had rescinded its resolution pretending to authorize the exchange of bonds; that he received the bonds now sued upon from Edward Houstoun after the rescinding of said resolution, as well as after they had been returned to the company in compliance with the rescinding resolution; that he was to receive twenty-five thousand dollars for carrying out this negotiation, which was unauthorized by said company and a wrong upon the same; that the State knew at the time of receiving the company's bonds and delivering the State bonds to Coddington that the rescinding resolution had been passed, and that Houstoun nor any other person had been given any authority by the company or the directors subsequent to the passage of said rescinding resolution to surrender said bonds to the State or exchange the same for State bonds, or part with said company bonds.

"And by John Collinson, (50 Old Broad Street, London,)

that he received the State bonds from Coddington ; that he received and held them as the agent of the State of Florida ; that the State coupons, up to January, 1873, were sent to New York City, to the place for the payment of the Florida Central Company pretended coupons, to be surrendered in exchange for the Florida Central Railroad Company coupons ; that he notified the Governor that they were there and requested him to send the railroad company coupons there for exchange ; that nothing has been paid by the State on said State bonds or coupons, and the said State bonds and coupons have never been sold.

"By C. L. Chase, Austin, Minnesota—"Was in London in 1873 ; went there to get the State bonds back and found they had not been sold." The circumstances of Houstoun's delivery of the company bonds to State through Coddington ; that he was defeated by the action of the State in this suit from receiving the return of the State bonds, and the State bonds had not been sold at the commencement of of this suit.

"State of Florida, ⎫
  Duval County.  ⎬

"Personally appeared M. S. Littlefield, a stockholder of the Florida Central Railroad Company, and he being duly sworn, says that he is such stockholder ; that the facts stated above can be proved by the parties above named ; that the testimony of said parties is material and cannot be dispensed with by the defendant in the cause, or otherwise ; that said parties reside beyond the limits of the State of Florida.                    M. S. LITTLEFIELD.

"Sworn to and subscribed before me this 24th day of June, A. D. 1875.                    J. H. DURKEE,
                    Notary Public and Referee.

"I hereby consent to the foregoing statement of what the Florida Central Railroad Company can prove by T. B. Coddington, John Collinson and C. L. Chase, sworn to by M. S. Littlefield, be admitted as testimony for the defendant, and

that such statement shall have the same force and effect, as testimony, as if said statements were depositions duly taken by commissioners from this court. H. BISBEE, Jr., June 24, 1675. Plaintiff's Attorney."

It is thus apparent from this testimony that these bonds are either in the hands of Collinson unsold, or in the control of S. W. Hopkins & Co., the agents of the Jacksonville, Pensacola and Mobile Company, undisposed of or unsold. If in the hands of S. W. Hopkins & Co., and the statements of their receipt (Exhibit M.) are accepted as true, they are held as collaterals to secure "subsequent advances that may be made by them against the one million of bonds," and the proof nowhere shows that any such advances were made against these bonds; on the contrary, by the admission of the State, they are unsold. Under these circumstances, there being jurisdiction in a court of equity to enfore the trust by decree and sale, has the State a right of action as against this defendant?

In the case of Holland vs. the State of Florida, 15 Fla. 454, we held that while the State bond as an obligation against the State, as a simple and primary debtor, was void for the want of constitutional power in the Legislature to authorize such obligation, yet that *under the statute* the State held the bonds of the company and the mortgage lien enuring thereby for the benefit of the holder of the State bonds. That the State, *under the Statute*, was to occupy these two relations, and that while the one failed for want of constitutional power in the Legislature to authorize it, the other must be sustained because the Legislature did have the constitutional power to create it, and it was the duty of the court to enforce it. This court did not hold that the relation and rights of the State as "trustee" were the *result of any equity springing from the circumstances, independent of the statute,* but that its relation as a trustee *was a creature of the statute.* That viewed in this light the lien created by the statute and the company bond was for the

benefit of the bondholders, and the property and franchises of the company were to be his security for payment. Whether his right was limited to the amount he actually paid for the bond we did not there decide. The view that the holder of the bond is restricted to the amount paid, so far as it is mentioned or based upon the idea that this court created such an equity as before referred to, is erroneous. We are inclined to think that the rights of the "holders" of the State bonds, if there are any such "holders" within the meaning of the statute, and entitled to its protection, are co-extensive with the lien of the State. The *statute* provides that "*all* moneys arising from the sale" shall be applied to the payment and satisfaction of the bonds issued by the State of Florida, and in the event of an investment of the proceeds before satisfaction of the claims, that the securities shall be "held by the State of Florida as trustee for the bondholders until said bondholders shall demand the same, upon which demand the Treasurer shall immediately turn over or pay *said securities to the bondholders.*" In the face of this express provision of the statute, how can a court of equity decree that the "bondholders" shall receive a *part* instead of "*all moneys*" arising from the sale, or a part instead of all the securities purchased with such money, and held as "trustee" by the State? Nor is it any reason for releasing the company that the State is not bound, when under the statute the company is bound at all events.

With this statement of that decision, and our explanation of it, it is only necessary to say further in reference to the present case, that no cause of action has been here shown by the State, as the records and proofs, instead of disclosing the existence of a "bondholder" within the meaning of the law, show simply that the bonds are unsold and still in the hands of the agents of the J. P. & M. R. R. Co. This company cannot hold these bonds with the right to enforce the lien of the State against the Florida Central Railroad Company under the statute. The consideration which was to

enure to the Florida Central Railroad Company for the bond which it transferred to the J. P. & M. Co., was the increased traffic and other results following an extension of the line of road owned by the J. P. & M. Company, which connected at Lake City with the road of this company; and, under the law, the duty of the J. P. & M. Company was, by an exchange and sale, to apply the proceeds to the extension of the line.

The Florida Central Company has, as against the trustee, the State, and the J. P. & M. Company, the right to resist such claim by the State in behalf of the J. P. & M. Company. The bond of the Florida Central Company is exchanged with the J. P. & M. Company under the law to enable it through an exchange with the State to receive the State bond, and to apply the proceeds of the sale thereof to the construction of this line of road. It would be entirely inconsistent with this whole legislation and the legal duties and rights of the J. P. & M. Company resulting therefrom, to permit it to hold bonds of the State of Florida, exchanged for bonds of the Florida Central Company, as a creditor of the latter company collecting through the trustee, the State, interest from the Florida Central Company.

Upon the issues and evidence as admitted by the State the case was with the defendant the Florida Central Railroad Company, and the bill should have been dismissed as to this company. This judgment, however, should have been without prejudice.

We next consider the appeal of Edward M. L'Engle. He claims to "represent and stand in the place of the Jacksonville, Pensacola and Mobile Railroad Company" for the purposes of this appeal, being a stockholder therein. This cannot be. The corporation is an artificial thing representing the whole body of the stockholders, and no one stockholder can prosecute an appeal from a judgment against the corporation. He can no more do so than could A prosecute an appeal against B. The same rule applies which

prohibits an individual stockholder from appealing or answering in the corporate name. In such case the corporation would not be before the court. No decree rendered against it would be binding. (2 Wall. 302.) If such is the right of one, it is the right of all, and each might set up a separate and inconsistent defence, and in any suit against a corporation we would have a half dozen inconsistent answers representing the same interest. Bronson vs. LaCross Railroad Company, 2 Wall. 302; 2 Blatch, 343; 15 Ill. 185; 25 Ill. 225; 6 Black, 69; 3 A. K. Mar. 27; 4 Ired. Eq. 195; 19 Eng. L. & E. 7; 1 Phil. 790; 4 Hals. 795; 29 Ga. 434; 4 Rand. 359.

This stockholder having no right to appeal for the company, that corporation is not before this court, nor can the judgment against it be reviewed on this appeal.

This party appeals also from an order dismissing the bill as to him, he having been sued as a stockholder in these two roads. After answer of this defendant, but before decree against him as such stockholder, the court, on motion of the defendant, "ordered and adjudged that the cause be discontinued as to the said defendant at the plaintiff's costs." This is an order dismissing the bill, "with costs," and there was neither counter-claims nor cross bill. It was the duty of this defendant upon this order of the court to prepare and present his memorandum of costs, and have them taxed. As remarked by the Supreme Court of Wisconsin, "The opposite party may well be supposed to be unable to tax the cost of his adversary," (4 Wis. 283;) and this taxation was necessary to a formal demand upon the plaintiff for these costs, or if defendant wished to ask a formal judgment he should have furnished the court with a memorandum of his costs. Whether he could have such judgment against the State is a question we do not consider. He could have had his costs taxed at any rate, and the rule controlling the subject would have been that applicable to ordinary civil suits of the State. We do not think it is too late to do this

now, and upon remanding this case such supplemental proceedings may be had if the party so desires. The order dismissing the bill as to this defendant is affirmed.

We next consider the appeal of Fannie S. Papy, executrix of the last will of Mariano D. Papy, deceased, and the appeal of Robert J. Washington. The only order that can be made in this court as to these two persons is to dismiss the appeal in each case.

The question as to the appeal of the executrix of the last will of Mariano D. Papy, deceased, is one easy of solution, about which there can be no doubt, controlled as it is by the most simple and elementary principles. The case so far as material, may be stated thus:

The Trustees of the Internal Improvement Fund (plaintiffs) allege that Mariano D. Papy holds certain securities which " equitably belong " to them. After answer of M. D. Papy and evidence taken in reference to the status and history of these securities, there was judgment declaring the Trustees of the Internal Improvement Fund entitled to them. (This judgment is dated August 20, 1875.) In no portion of this record, before this judgment, is there a suggestion of the death of Mariano D. Papy; and the only thing in reference to the whole subject is a certified copy of letters testamentary issued to the executrix of the last will of Mariano D. Papy, deceased, which were issued the 11th of July, A. D. 1875, and were filed in this cause the 6th of January, 1876, after the rendition of the final judgment. It thus appears that Mariano D. Papy had died before the decree was pronounced. The cause of action not surviving, as a matter of course the suit by his death abated as to him. No order of the court or other matter making his executrix a party is in the record. For this reason she had no standing in the court below, and is in no condition to be heard upon appeal here.

What may be the proper proceeding upon the part of the plaintiffs to revive the suit as against the executrix, or what

19

may be the proper proceeding upon the part of the executrix to be made a party in the court below to contest the validity of this judgment against her testator, are matters for the consideration of each of these parties.   So far as this court is concerned the executrix is in no condition to prosecute an appeal.   The simple filing of letters testamentary after final judgment against her testator makes her no party to the suit, and the appeal, so far as she is concerned, must be dismissed.   This general subject in proceedings other than under the code, is examined in the case of Alston vs. Rowles, 13 Fla. 113; and there is nothing in the code which sanctions the proceeding here had by the executrix.

The case of Robert J. Washington, without going into unnecessary details, is this :   The Trustees of the Internal Improvement Fund, plaintiffs, bring this action against Milton S. Littlefield and the J. P. & M. R. R. Company, claiming that they are entitled to certain securities purchased by him or the company, under an agreement made with the trustees to purchase and surrender these securities to them for cancellation.   On the 20th of August, A. D. 1875, the court " adjudged " these securities to be the property of the trustees, and this is the final judgment rendered as to them.   On the 6th of January, A. D. 1876, Robert J. Washington filed, among the papers in this case, the report of a special master of the Circuit Court of the United States for the Northern District of Florida, stating a sale on the 2d day of August, 1875, of the interest of M. S. Littlefield in these securities, under a decree made in a case pending in the Circuit Court of the United States, wherein John H. Miller was plaintiff and Milton S. Littlefield and others were defendants.   The master reported that at this sale Robert J. Washington, through his agent, E. M. L'Engle, was the purchaser of said securities.   Upon the same day a certified copy of the decree of the Circuit Court of the United States in the case stated, directing a sale of Littlefield's interest in these securities, was also filed in this case.

The record discloses no action taken by the Circuit Court of Duval county upon the filing of these papers. Robert J. Washington was no party to the record at the date of the final judgment, and at no time did he ask the court to make him a party for any purpose. The claim made here is that he has all the interest in these securities which M. S. Littlefield had; that while not a party to the proceedings in the Circuit Court, he has the right to join in the appeal, and to represent and stand in the place of M. S. Littlefield, as his successor in the ownership of the bonds affected by the judgment of August 26th, 1875. These papers filed by Washington constitute no part of the record of the judgment in the Circuit Court of Duval county. That court has taken no action in reference to them, nor has it been asked so to do. To the final judgment Washington is neither party nor privy. As remarked by Chief Justice Marshal, "the only parties the court can know are those in the record. They cannot permit counsel who represent parties who may think themselves interested, not in the record, to come in and interfere." 9 Pet. 494. The code, which controls this appeal, provides that "any party aggrieved may appeal;" and this means "a party to the record or his representatives, and not any person who may feel aggrieved when he is no party to the suit." 28 Barb. 306. The court in the case in 7 Paige, 51, cited by appellant, holds that where an executor institutes proceedings in his own name only before the surrogate, any other person who has an interest in establishing the will, and who would be precluded if the decision was against its validity, has an unquestionable right to intervene and make himself a party to the proceeding. Chancellor Walworth cites as authority for this view the laws and practice of the English Ecclesiastical Courts; and such is unquestionably the practice in those courts, when exercising original jurisdiction in this particular matter. The Chancellor remarks further: "And they probably have the same right to come in as interveners to protect their rights

The State of Florida et al., v. The Florida Central R. R. Co. et al.

·on appeal." For this statement of a probability he gives no ·authority, and we can find no sanction for such a practice in any English or American case. By the revised statutes ·of New York provision is made that any legatee or devisee named in the will, or any heir or next of kin to the testator, may appeal to the Supreme Court from the decision of the surrogate, either admitting such will to probate or refusing the same. 42 N. Y., 279.

In Philips vs. Shelton, (6 Iowa, 545,) the Supreme Court of Iowa held that a party has no right to appeal until some question to which he was a party has been adjudicated by the court of original jurisdiction. The action of the party whose appeal was dismissed in that case is very similar to that of Washington here. The action was for specific performance of a contract to convey real estate. S. filed a statement that he was a creditor of defendant, and had had attached the land claimed by the complainant. There was nothing in the transcript to show that S. was made a party to the suit, or that any steps were taken by him further than to file said statement, except to appeal from the decree rendered in favor of complainant. The appeal was dismissed. See also 13 Smedes and Mar., 97; 2 California, 57; 13 La. An., 199.

The practice in the English courts is, that a person not a party to the record cannot appeal without some action of the court exercising original jurisdiction as to him or his rights. When not a party to the case, he must first resort to the court below. Berry vs. the Attorney-General, 2 Mac. and Gov., 16, cited in 2 Daniels' Chy. Prac., 1541.

In the case of Gifford vs. Hort, 1 Sch. and Lef., 41, it is held that if the right of a remainderman or of any person entitled to the estate in any way is bound by the decree, he, as well as the person against whom it was made, has a right to appeal from it. But he does not appeal by filing a simple statement setting forth what he conceives to be his right, and then enter an appeal, as was done here. He files a·

supplemental bill to make himself a party to the suit, and to have the benefit of the proceedings therein for the purpose of appealing.

It is said that creditors coming in before the master under a decree may appeal, although not parties to the bill. Such is the remark of the chancellor in the case of Gifford vs. Hort. The distinction between this case and the case of the creditors is evident. A creditor coming into the master's office to contest the claims of others, or to maintain those of himself, is bound by the decree and is substantantially a party to the case, although his name may not have been inserted as a party. If it is a general creditor's bill, then all creditors coming in are, technically, parties to the bill. The court in this case has taken action with reference to his rights, has exercised original jurisdiction as to him with him before it, and there is the proper basis for the exercise of supervisory and appellate jurisdiction as to the action of the court in reference to his claim or demand.

Even, therefore, if Washington's rights were affected (and it is only in such cases that he can come in and appeal) by the decree against Littlefield, and the practice of the English courts prevail in this matter, (as to which question we say nothing,) Washington has not taken the proper course to give himself the status of an appellant in this court. His appeal must, therefore, be dismissed.

The following judgment will be entered in this cause:

This cause having been submitted at a previous term of the court on briefs by counsel for both parties, and a transcript of the record of the judgment aforesaid having been seen and inspected, it is considered by the court that the appeals of Fannie S. Papy, executrix of the last will and testament of Mariano D. Papy, deceased, and of Robert J. Washington, are dismissed.

It is further considered that the order dismissing the case as to Edward M. L'Engle is affirmed.

It is further considered that there is error in said judg-

ment as to the Florida Central Railroad Company; wherefore it is ordered, adjudged and decreed that said judgment be reversed as to said Florida Central Railroad Company, and that the case be remanded with directions to dismiss the bill as to said company without prejudice to the rights of persons who may be *bona fide* bondholders under the statute, if any such there be; that the Florida Central Railroad and all property appertaining thereto be delivered to the Florida Central Railroad Company, and that the master in this cause be given such reasonable time for the settlement of his accounts, not beyond the first day of November next, as the court may deem proper, and for such other proceedings as are comformable to law and consistent with the opinion and judgment of this court in this cause.

It is further considered that the respondents recover against the said Fannie S. Papy, executrix of the last will and testament of Mariano D. Papy, deceased, and against Robert J. Washington and Edward M. L'Engle, all costs by said respondents in this behalf expended, and that the costs in this behalf expended by the Florida Central Railroad Company be taxed by the clerk against the respondent, the State of Florida.