## Case No. 17,434.

WESTERN DIVISION OF WESTERN N. C. R. CO. v. DREW et al. (two cases).

SCHUTTE et al. v. FLORIDA CENT. R. CO. et al.

[36 Leg. Int. 328; 3 Woods, 691.] [1]

Circuit Court, N. D. Florida. May 31, 1879.

FOREIGN DEPOSITIONS — ORAL EXAMINATION OF WITNESSES—CONSOLIDATION OF RAILROAD COMPANIES—EFFECT ON PREVIOUS LIENS—CONVERSION OF TRUST FUNDS—INVESTMENT IN RAILROAD STOCK—RIGHTS OF BENEFICIARIES—STATE BONDS IN AID OF RAILROAD — INVALIDITY — RIGHTS OF HOLDERS—SUBROGATION TO STATE'S MORTGAGE—RAILROAD BONDS—RECEIVERSHIP.

1. Depositions of Dutch bondholders, complainants, in a suit in equity, were taken in

1 [Reported by Hon. William B. Woods, Circuit Judge. The syllabus and statement are here reprinted by permission from 3 Woods, 691. The opinion is republished by permission from 36 Leg. Int. 328, where it is given in extenso.]

Holland. Before the depositions were actually taken by the examiner their counsel had read to them the interrogatories, and had prepared their answers in the English language. *Held* (1) that the fact that the witnesses had heard the interrogatories in advance was not a ground for suppressing the depositions; and (2) that examination of witnesses should be made by the examiner, and not by counsel, in advance, and because this was not done in this case the depositions should be suppressed.

2. Equity rule sixty-seven authorizes the court to appoint examiners for the taking of depositions orally, outside as well as inside its territorial jurisdiction.

[Cited in Bate Refrigerating Co. v. Gillette, 28 Fed. 676; Re Steward, 29 Fed. 813; Arnold v. Chesebrough, 35 Fed. 16; Celluloid Manuf'g Co. v. Russell. Id. 17; Johnson Steel Street R. Co. v. North Branch Steel Co., 48 Fed. 192.]

3. Equity rule seventy-eight does not change the English practice, and does not allow, generally, the oral examination of witnesses on the trial; it permits witnesses to be so examined merely to verify some document referred to in the pleadings, or to establish some fact of a formal character which has been inadvertently omitted in the testimony.

4. Certain parties purchased a railroad and received a deed therefor, but left a part of the purchase price unpaid, and then procured an act of the legislature, by which they, as purchasers and owners, were incorporated. *Held*, that the company so formed took the railroad, subject to the vendor's lien for the unpaid purchase money.

[Cited in Central Trust·Co. v. Florida Ry. & Nav. Co., 43 Fed. 753.]

[Cited in Bloxham v. Florida Cent. & P. R. Co. (Fla.) 17 South. 923.]

5. The consolidation of said company with another did not discharge said lien. The notice of the lien with which the first company was charged affected also the consolidated company.

6. Where trust funds were fraudulently used by a trustee to purchase stock in a railroad company, and said company was afterwards, in pursuance of authority granted by the legislature, consolidated with another company; *held*, that the beneficial owner of the trust funds, having knowledge of the misappropriation, and suffering the trustee to retain possession of the stock in the new company, must seek the enforcement of his equities arising from such misappropriation against the stock in the consolidated company, held by the unfaithful trustee.

7. Where such beneficial owner promoted and acquiesced in the issue and sale of bonds by the new consolidated company, it could not except to the bona fides of the issue and sale, and the holders of the bonds so issued had a better equity as against the property of the railroad company than such beneficial holder.

8. A railroad company issued its bonds, which, by virtue of an act of the legislature, the officers of the state received in exchange for an equal amount of state bonds. The same act created a statutory mortgage in favor of the state, to secure the payment of the bonds of the railroad company, for which the state bonds were exchanged. It was decided by the supreme court of the state, that said state bonds were issued without constitutional authority, and the state was not bound thereby. *Held*, that under these circumstances the holders of the state bonds, given in exchange for the railroad bonds, had a right to enforce, for their own benefit, the said statutory mortgage in favor of the state.

[Explained in Knevals v. Florida Cent. & P. R. Co., 13 C. C. A. 416, 66 Fed. 230.]

9. The fact that the bonds of the railroad company were issued and exchanged for state bonds, in order that the stockholders of the railroad company might use the proceeds of the state bonds for their own private advantage, and they were so used, and not for the purposes contemplated by the statute which authorized the exchange, is no defense against the railroad bonds in the hands of a bona fide holder.

10. The possession of a negotiable bond is strong prima facie evidence of just title, and, in ordinary cases. throws upon the party questioning it the burden to show that the holder had notice of some vice or defect which vitiates his title.

11. Where the lien of bondholders on railroad property is created by statute, the statute regulates their rights. notwithstanding the fact that without its aid a resulting equity would have arisen in their favor.

12. Where, at the instance of bondholders secured by a mortgage lien upon a railroad, a receiver has been appointed to take possession of and preserve the railroad and conduct its business. the proceeds and profits of the business in the hands of the receiver are subject to the charges of administration and management and the liens and trust in behalf of which the receiver was appointed. Neither the railroad company itself nor any party whose claim is based on the company's rights, can demand any of the income in the receiver's hands until the prior liens have been satisfied.

13. The act of the legislature of Florida, of January 8, 1853, relating to mortgages. was not intended to prevent a court of equity from taking possession of mortgaged property, where, by the negligence or misfeasance of the mortgagor it was being wasted so as to jeopard the security of the mortgagee.

2 [In equity. The cases above mentioned being intimately connected, were argued and decided together, upon the pleadings and evidence. They related to two railroads in Florida.; the Florida Central, extending from Jacksonville to Lake City, and the Jacksonville, Pensacola & Mobile, extending from Lake City to the Chattahoochee river, with the branch from Tallahassee to St.· Mark's. Suit No. 1 related to the Florida Central Railroad, suit No. 2 to the Jacksonville, Pensacola & Mobile Railroad, and suit No. 3 to both. The complainants in suit No. 3 were Hollanders, who had purchased over $3,000,-000 of Florida state bonds, issued in 1870, in exchange for the bonds of the two railroad companies above mentioned. The whole amount of state bonds issued was about $4,-000,000. Of these $3,000,000 were issued in exchange for bonds of the Jacksonville, Pensacola & Mobile Railroad Company, and $1,-000,000 in exchange for the bonds of the Florida Central Railroad Company. The railroad bonds were by the statute authorizing the exchange made a lien on the railroads of the companies issuing them, respectively. They were not to exceed sixteen thousand dollars per mile. The $4,000,000 being in excess of this, some of the state bonds, two hundred and twenty-four in number, were returned and canceled, and certain of them were never sold. The supreme court of Florida decided that the state bonds referred to

were issued contrary to the provisions of the state constitution, and were void, but that the state held the bonds of the railroad companies as trustee for those who had purchased its own bonds, and that these purchasers, for the amount of state bonds purchased by them, had a right to the lien of the companies' bonds held by the state. Hence, Schutte and others, as holders of the state bonds, brought their bill against the two railroad companies, to foreclose this lien and recover their money, by a sale of the roads. With regard to the Jacksonville, Pensacola & Mobile Railroad, there was an outstanding lien upon it of $472,000 and interest for unpaid purchase money due to the trustees of the internal improvement fund of Florida, who had sold the road in 1869 to parties from whom the Jacksonville, Pensacola & Mobile Railroad Company subsequently acquired it. Therefore, the said trustees were made parties to the suit.

[The two suits, number one and number two, were brought a short time prior to suit number three, by the Western Division of the Western North Carolina Railroad Company, claiming an interest in the two Florida railroads prior and superior to that of Schutte and the other Dutch bondholders. The circumstances on which this claim was founded were these: In 1868, or 1869, the state of North Carolina granted to the Western Division of the Western North Carolina Railroad Company $6,000,000 of North Carolina state bonds, the state taking a large portion of the capital stock of the company. George W. Swepson, the president of the company, co-operating with Milton S. Littlefield, who succeeded him as president, disposed of these bonds in New York, and fraudulently used a large part of their proceeds in purchasing a controlling interest in the Florida railroads above mentioned. The companies owning these roads were in default in the payment of former issues of bonds, which had been guaranteed by the internal improvement fund of Florida, and under a law of the state, the Florida Central Railroad was sold in 1868, and the Jacksonville, Pensacola & Mobile, consisting, originally, of two roads, was sold in 1869, and new companies were organized by the purchasers to carry them on. Swepson and Littlefield, with the North Carolina funds of which they acquired the possession in the manner above stated, purchased a large majority of the new stock of the Florida Central Railroad Company, and furnished the means for purchasing the Jacksonville, Pensacola & Mobile road, when it was sold in 1869; that is, they bought up and furnished the old bonds with which the purchase money was paid by the nominal purchasers, amounting to $960,300 of said bonds. The North Carolina Company alleged that this fraudulent appropriation of its money was not discovered for a long time, and that a resulting trust arose in its behalf to recover and have the property procured thereby. The principal question in

the case was, whether the North Carolina Company, after its discovery of the fraud, did not deal with Swepson and Littlefield in such a manner as to ratify their action as stockholders and officers of the Florida roads, in issuing the bonds of the two Florida companies for which the Florida state bonds held by the Dutch bondholders were exchanged. The court was of opinion that the evidence in the case showed such a ratification. The latter company, however, contended that the Dutch bondholders knew of certain fraudulent practices used in putting out these bonds, and that hence they were not bona fide holders and ought to be postponed to it.

[J. B. Stewart and J. K. Herbert, for Western Division of the Western North Carolina Railroad Company.

[M. H. Carpenter, W. G. M. Davis, and C. D. Willard, for J. Fred. Schutte and others.

[J. M. Baker and J. T. Walker, for Florida Central Railroad Company.

[G. P. Rainey, Atty. Gen., of Florida, for trustees of the internal improvement fund.

[Henry R. Jackson, for holders of bonds of the Pensacola & Georgia Railroad Company.

[Before the final hearing, certain preliminary questions were raised and decided.

[Mr. Stewart, for the Western Division of the Western North Carolina Railroad Company, moved to suppress certain depositions taken by the Dutch bondholders in Holland, on the ground that the witnesses came before the commissioners who took the depositions with prepared answers in writing in the English language, and on being questioned why they used such prepared answers, said that it was more convenient and would save time. Another ground for the motion was, that the interrogatories had been read in advance to the witnesses by the counsel for the bondholders. In support of his motion, he cited 3 Greenl. Ev. § 324; Shaw v. Lindsey, 15 Ves. 380. See Case No. 17,433.

[BRADLEY, Circuit Justice. The objection to the depositions, that the witnesses had seen the interrogatories before being called on to give their testimony, is not a good one. According to the American practice, the showing of the interrogatories to the witnesses in advance of their answers, is not open to objection. The fact, however, that the answers of the witnesses were prepared in writing by their counsel in advance, is fatal to the depositions. The examination should be made by the examiner, and not by counsel, before the witnesses are brought before the examiner to give their testimony. The depositions must be suppressed.

[Mr. Carpenter moved to suppress certain depositions taken for complainant in suits numbered one and two, in the city of New York, on the ground that they were taken before an examiner appointed by the United States circuit court for the Northern district of Florida, and under equity rule sixty-seven, the court had no authority to appoint an ex-

aminer beyond its own territorial jurisdiction.

[BRADLEY, Circuit Justice. The rule should be literally construed. It was intended to authorize the appointment of examiners outside as well as inside the territorial jurisdiction of the court. The taking of testimony before an examiner, orally, in the presence of the parties, is much more satisfactory than taking it by commission, and the rule should be construed so as to allow this to be done whenever a party desires it. The motion to suppress the depositions is overruled.

[Counsel proposed to examine witnesses, orally, before the court upon the trial of the causes.

[BRADLEY, Circuit Justice. I can not allow this to be done, except for the purpose of verifying documents referred to and set out in the pleadings. A court of equity will not sit and try causes by the examination of witnesses in open session, as if it were trying a case by a jury. It is not the purpose of the seventy-eighth equity rule to allow this to be done. That rule only reserved the power in the court to verify documents set out in the pleadings, or to establish some fact of a formal character which had been inadvertently omitted in the evidence, and which would not require an extended examination. In other words, the seventy-eighth rule does not alter the English practice on the subject. The substantial evidence in the case should be taken according to equity rule sixty-seven.] [2]

BRADLEY, Circuit Justice. These cases involve vital questions relating to the title of and incumbrances upon two railroads, namely, that called the Florida Central Railroad, extending from Jacksonville to Lake City, and that called the Jacksonville, Pensacola & Mobile Railroad, extending from Lake City to the Chattahoochee river, including the branches from Tallahassee to St. Mark's, and that leading to Monticello. It is conceded by all the parties that both roads were duly sold by the trustees of the internal improvement fund, under the internal improvement act, in 1868 and 1869, and those sales constitute a starting point upon which all the claimants rely. The Florida Central was thus sold on the 4th day of March, 1868, to William E. Jackson and his associates; and the Pensacola & Georgia Railroad, being the road from Lake City to Quincy, and the Tallahassee Railroad, being the road from Tallahassee to St. Mark's (which two roads constitute the greater part of the Jacksonville, Pensacola & Mobile Railroad), were sold on the 20th day of March, 1869, to Franklin Dibble and his associates. Conveyances were made to the purchasers in pursuance of these sales. No question is made about the title acquired by the purchasers of the Florida Central Railroad, nor of its subsequent devolution to the present company, called the Florida Central Railroad Company. The legislature of Florida, by an act passed

on the 29th day of July, 1868, on the application of the purchasers, incorporated them into a body politic by the name aforesaid, and as purchasers and owners of the road. As such purchasers and owners they were made a corporation, and authorized to organize as such, and "to declare the amount of which the stock in said Central Railroad Company should consist, and to divide the same into shares." They did organize, and created capital stock to the amount of 5,500 shares, took possession of their road and commenced to operate it. It is not denied that the greater portion of the capital stock was subsequently purchased by George W. Swepson, of North Carolina, who had the same transferred to Milton S. Littlefield. At least as early as the early part of 1870, Swepson and Littlefield, or one of them, held nearly all the stock of the road, and controlled and managed the company. The Western Division of the Western North Carolina Railroad Company has since claimed that it was the money of that company which Swepson and Littlefield used in the purchase of this stock, and that they misappropriated the same in making such purchases, and therefore became the holders of said stock for the use and benefit of said company. This has been conceded by Swepson and Littlefield, and the stock is now understood to be held for the use and benefit of the Western North Carolina Railroad Company, which has been substituted to the rights of the said Western Division. Thus far, therefore, we are not met by any controversy which calls for the adjudication of this court.

The history of the Jacksonville, Pensacola & Mobile Railroad Company, and the roads which it claims to have acquired, is more complicated. As before stated in that case, there were two roads purchased by the same parties, that of the Pensacola & Georgia Railroad Company, extending from Lake City to Quincy, with the branch at Monticello, and that of the Tallahassee Railroad Company, extending from Tallahassee to St. Mark's. Each of these companies had issued bonds under the internal improvement act, which were guarantied by the internal improvement fund. Default in paying the interest on these bonds, and the installments due to the sinking fund, was the occasion of the roads being sold by the trustees. The sales were for amounts nearly equal to the principal of these outstanding bonds. The amount bid for the Pensacola & Georgia Railroad was $1,220,000, and the amount bid for the Tallahassee Railroad was $195,000, and the purchasers were allowed to pay the purchase money, if they could, in the said guarantied bonds. They did bring in and surrender such bonds to the amount of $806,600 of the Pensacola & Georgia Railroad Company, which were received at par, and $153,700 of the Tallahassee Railroad Company, which were received at ninety-four and ninety-five cents to the dollar. It is conceded that a balance remained still to be paid of $472,065, and that that amount of the bonds of the said two companies

---

[2] [From 3 Woods, 691.]

are still outstanding. For this amount a draft or check was given, which was never paid, and which the parties giving it did not intend to pay. But by giving this check as cash, the purchasers prevailed upon the agents of the trustees to deliver deeds for the property. It was a sheer fraud, and a lien for the balance of the purchase money, amounting to $472,065, immediately arose in favor of the trustees, and has ever since attached to the property.

The holders of the outstanding bonds referred to are interested in this lien, because the purchase money which it represents is the fund on which the trustees rely for the payment of said bonds in relief of the internal improvement fund itself, so far as it is liable therefor; and, also, because the said purchase money is the proceeds of the property which constituted the security of the said bonds. The holders of the said outstanding bonds have, in divers ways, attempted to enforce their indirect claim to this purchase money, and to the lien for its payment; but the supreme court of the United States, in the case of Florida v. Anderson, 91 U. S. 667, decided that in view of all the complicated rights of the parties, the lien must be enforced by the state, or the trustees of the internal improvement fund, which the latter have endeavored to do, and which they seek to do in the suits now under consideration. As against the Jacksonville, Pensacola & Mobile Railroad Company, the existence of this vendor's lien was adjudicated by the Duval county circuit court, by a judgment rendered, on the second day of April, 1874, and a recovery was had by the trustees for the principal and interest then due, amounting to $661,845.55. This judgment was rendered in a suit brought by the state of Florida and the trustees of the internal improvement fund, against the Jacksonville, Pensacola & Mobile Railroad Company and Milton S. Littlefield; and although that judgment was subsequently reversed in part, yet, in a subsequent report of the same case in 16 Fla. 708, the supreme court declare that, on this point, the judgment of the Duval county circuit court was final, and that the matter was res judicata. But if it were not so, I have no hesitation in saying that the vendor's lien for the said unpaid purchase money, with interest and costs, was valid and binding on the Jacksonville, Pensacola & Mobile Railroad Company. The purchasers, Franklin Dibble and his associates, clearly held the railroads subject to the lien. They became incorporated as purchasers and owners of the property, by an act of the legislature of Florida, passed the 24th day of June, 1869, by the name of the Tallahassee Railroad Company; and this company, therefore, being constituted of the same persons, only clothed with corporate powers, received the property subject to the same lien. On the 25th day of May, 1870, the Tallahassee Railroad Company became consolidated with the Jacksonville, Pensacola & Mobile Railroad Company, under and by virtue of the 14th section of the act incorporating the latter company, passed June 24, 1869, entitled "An act to perfect the public works of the state;" and one of the terms of the consolidation was that the consolidated company, under the name of the Jacksonville, Pensacola & Mobile Railroad Company, should, and it did thereby assume all the debts and obligations of the Tallahassee Railroad Company, since its organization. This consolidation, by which the two companies joined their properties together, did not discharge the lien. The property of the Tallahassee Company was brought into the common concern with all pre-existing equities attaching thereto. The consolidated company having, as one of its component parties, the Tallahassee Company, which held subject to the lien, cannot be regarded as a bona fide purchaser without notice. The notice with which that company was affected, in relation to the property brought with it into the common fund, affected also the consolidated company. Besides, the persons who held the principal part of the stock in and controlled the one company, likewise held the principal part of the stock in and controlled the other company. As to the other parties in these suits, the Western Division of the Western North Carolina Railroad Company concedes the existence and priority of the said lien, and the holders of the state bonds, issued in 1870, in exchange for the bonds of the Jacksonville, Pensacola & Mobile Railroad Company, and of the Florida Central Railroad Company, who are represented by the complainants in the bill of J. Fred. Schutte and others, do not contest the lien, having entered into amicable arrangement with the greater portion of the holders of the outstanding bonds, who are interested therein. I shall, therefore, hold, for the purposes of this case, that the trustees of the internal improvement fund are entitled to the first lien on the property of the Jacksonville, Pensacola & Mobile Railroad Company, extending from Jacksonville to Quincy, and from Tallahassee to St. Mark's, including the Monticello branch of the roads.

I will now proceed to the controversy which subsists between the Western Division of the Western North Carolina Railroad Company and the holders of the state bonds issued in 1870. The former claims to be entitled to certain equities arising from the fraudulent use of its moneys by George W. Swepson and Milton S. Littlefield, in purchasing the bonds and property of the Pensacola & Georgia Railroad Company and the Tallahassee Railroad Company, before the devolution of said property to the Jacksonville, Pensacola & Mobile Railroad Company. The latter, namely, the holders of the state bonds, claim that they are bona fide holders of said bonds, without any notice of the frauds committed by Swepson and Littlefield, or of the equities of the North Carolina Company, and that they are, therefore, entitled to have the railroad and property of the Jacksonville, Pensacola & Mobile Railroad Company applied to the payment of their bonds, before any relief is granted to the

North Carolina Company. This is the real controversy in these cases, although the said bondholders (who, being mostly residents of Holland, may, for convenience, be called the "Dutch" bondholders), affect to ignore the claims of the North Carolina Company, and seek to have a decree irrespective thereof.

It is established beyond controversy, that the bonds which were used by F. Dibble and his associates, in payment of the bid for the two railroads in question, namely, that of the Pensacola & Georgia Railroad Company and that of the Tallahassee Railroad Company, were furnished to them by George W. Swepson, and that Swepson procured the same by a fraudulent use of money in his hands, produced by the sale of North Carolina state bonds belonging to the Western Division of the Western North Carolina Railroad Company, of which he, Swepson, was president. After the roads were bid off at the said sale thereof by the trustees of the internal improvement fund, and before any payment was made, on such bid, the purchasers, F. Dibble and his associates, on one part, and Swepson on the other, entered into a written agreement, dated March 26, 1869, by which, after reciting the fact of the sale and the amounts respectively bid for said railroads, it was, amongst other things, agreed that Swepson should deliver, as he should come into possession thereof, to be surrendered to the trustees of the internal improvement fund, the first mortgage bonds of said roads, purchased by him, amounting to about $900,000 of the Pensacola & Georgia bonds, and about $150,000 of the Tallahassee Railroad bonds—the former to be surrendered at par, and the latter at their pro rata of the amount bid for said road at said sale, and the balance of the purchase money to be supplied by said F. Dibble and his associates. Secondly, it was agreed that as soon as might be after the title should be acquired from the trustees, first mortgage bonds should be issued, secured by a mortgage or trust deed on said roads, their equipments and franchises, to be given to said F. Dibble and Swepson as trustees. Thirdly, it was agreed that the bonds so to be issued should be delivered to Calvin B. Dibble and George W. Swepson, to be sold or negotiated, and the amount thereof for that purpose should be paid to George W. Swepson, to reimburse him for the amount of money paid out by him in purchasing the first mortgage bonds aforesaid, and for commissions and attorney's fees, together with interest, and the additional sum of $100,000. Fourthly, it was agreed that the stock was to be divided and owned as follows: Swepson to have one-third, Calvin B. Dibble to have enough, with Swepson's share, to constitute a majority, and F. Dibble and his associates to have the remainder. Fifthly, it was agreed that Swepson should appoint four directors; F. Dibble and associates four, and that Calvin B. Dibble should be the ninth director, which arrangement was to last until Swepson was fully paid. In pursuance of this agreement Swepson shortly after furnished the first mortgage bonds which were delivered to the trustees of the internal improvement fund, namely, $806,600 of the Pensacola & Georgia Railroad bonds, and $153,700 of the Tallahassee Railroad bonds, in all $960,300 of said bonds, leaving still due as beforesaid the sum of $472,065. The deeds for the property were executed by the trustees in the name of the purchasers on the 8th of April, 1869, but delivery of them was withheld until the balance should be paid. An arrangement was made that two of the trustees should go to New York with the deeds, and there receive the said balance in cash. As before remarked, a worthless check was palmed off upon the trustees, who gave a receipt for the amount and delivered the deeds. In the consummation of this device Swepson bore the principal part. The deeds were subsequently recorded in Florida on the 22d day of April, 1869. On the same day, Dibble executed to Swepson a trust deed as security for the fulfilment of the engagements entered into by the agreement of 26th of March, which trust deed was never recorded, its purpose being accomplished by carrying out the arrangement contemplated. This trust deed recited that Swepson had paid for Dibble and associates, in purchase of said roads, bonds to the amount of $960,300, and that he had paid to the trustees for the same parties the sum of $472,065, being the full amount due for said roads; it also recited the engagements of Dibble made in the agreement of 26th March, and after formally conveying the property of the two railroads as conveyed by the trustees to Dibble, it declared the object of the trust deed to be to enable Swepson—which he bound himself to do—to convey the same to the corporation to be formed consisting of Dibble and his associates, as soon as they should have granted to them such or similar relief as the legislature had granted William E. Jackson and his associates by the act of July 29, 1868; it was also declared to be for the purpose of securing Swepson in all advances made as specified and agreed upon in the agreement of March 26, 1869, and the advancement of said sum of $472,065 until such time as said relief shall have been granted, and said Swepson should have conveyed said property to said corporation.

The counsel for the North Carolina Railroad Company places great stress on this trust deed, insisting that it enured to the benefit of the said company, whose money had been fraudulently used by Swepson, in purchasing the $960,300 bonds; and that it conveyed the legal title of the property to Swepson, in whom it still remains. inasmuch as he never executed any deed in pursuance of the trust. But this trust deed was never

recorded, and was never heard of by any of the parties to these suits until since the commencement thereof; and as all the terms of the deed were complied with, which made it the duty of Swepson to convey the property to the company thereafter formed; and as the title (as we shall presently see) was sufficiently transferred to the company in other ways, it is to be presumed that this deed was either looked upon by the parties to it as having no further office to perform, or the execution of· a deed in pursuance thereof, was purposely omitted in order to perpetrate further frauds on some other innocent parties. The fact is. that an act was soon after procured, similar to the act passed in behalf of William E. Jackson and his associates, in relation to the Florida Central Railroad, and bonds were given, and the stock was disposed of amongst the parties, in accordance with the agreement of March 26, 1869. The act referred to was passed on the 24th day of June, 1869, and is entitled "An act for the relief of Franklin Dibble, A. Huling, E. M. Cheyney, and their associates, purchasers of the railroad from Tallahassee to St. Mark's, and of the railroad from Quincy to Lake City, and incorporating the Tallahassee Railroad Company." It recites the sale of the two roads on the 20th day of March, 1869, by the trustees of the internal improvement fund, to Franklin Dibble, A. Huling, E. M. Cheyney and their associates, and that it was essential for the interests of the people of this state, that the parties aforesaid should be invested with such corporate powers as were needful for the operations of said road, as well as more accurately to define their powers and duties. It then enacted as follows:

"Section 1. That the said Franklin Dibble, A. Huling, E. M. Cheney, and their associates, and their successors and assigns, are hereby made a body politic and corporate, under the name of the Tallahassee Railroad Company, and they, their associates and assigns, as such body politic and corporate, are hereby vested with, and shall be entitled to exercise and enjoy the like powers. franchises and privileges as were granted to the Pensacola & Georgia Railroad Company and the Tallahassee Railroad Company, by the several acts incorporating said Pensacola & Georgia Railroad Company and said Tallahassee Railroad Company, and with the right to hold, operate and enjoy the said railroad, under the name of the Tallahassee Railroad Company, subject to the conditions annexed to the sale of said roads by the trustees of the internal improvement fund. and by and in the name of the Tallahassee Railroad Company, they, their associates, successors and assigns, may purchase, receive and hold lands and tenements, goods and chattels, of whatsoever character that shall be necessary or useful for the purposes of said railroads, and the same to grant. sell. mortgage or dispose of, and to sue and be sued, implead and be im-

pleaded, to make a common seal, and at pleasure to break and alter the same, and to establish and put in execution such by-laws and regulations as may be necessary and expedient, not inconsistent with the constitution and laws of the state of Florida.

"Sec. 2. Be it further enacted, that the provisions of the act incorporating the Pensacola & Georgia Railroad. Company, for the protection of its roads from trespass, injury or intrusion. and providing for the punishment of persons who shall trespass upon or injure the same, be, and they are hereby made applicable to all cases of trespass, injury or intrusion on, to, or upon the aforesaid railroads, and the said Tallahassee Railroad Company shall be entitled to all the benefits and protection thereof and therefrom. ·

"Sec. 3. Be it further enacted, that said Franklin Dibble, A. Huling, E. M. Cheney, and their associates, shall be entitled to declare the amount of which the stock in the said Tallahassee Railroad Company shall consist, and to divide the same into shares, which shares, however, shall not be less than one hundred dollars each.

"Sec. 4. Be it further enacted, that said Tallahassee Railroad Company may, when they shall see fit, rent, lease. farm out or sell, any part of the said railroad to any person or persons, corporators or corporations. upon such terms as may be agreed on, provided said sale, renting or leasing, shall not be made to any person or persons, or corporation, owning any railroads out of the state of Florida. ·

"Sec. 5. Be it further enacted, that the board of directors of the said Tallahassee Railroad Company shall consist of nine directors, of whom the president of said company shall be one. The first directors shall be elected or appointed within one month after the passage of this act, and annually thereafter. at such time as may be fixed by resolution or law, but the said company shall not be dissolved for failure to elect or appoint its directors, so long as the said railroads shall be kept running and in operation, but the directors may be elected or appointed at the next meeting thereafter.

"Sec. 6. Be it further enacted, that said company shall have the right to issue coupon bonds in such denominations and at such rate of interest, annual or semiannual, and payable at such time and place as they may determine, and may secure the same by mortgage on said railroads, their equipments, depots, workshops, property and franchise, executed in such form and manner as may be determined: Provided. that any deed of trust, mortgage, conveyance, bond or bonds, or security, which may have been executed. made. created or contracted for. as a lien on said railroads or otherwise, by said Franklin Dibble. in behalf of himself and his associates, prior to the passage of this act, shall be valid and effectual to all intents, either at law or in equity, as a lien or mortgage, or

security on said railroad, as if the same had been made by virtue of this act, and shall in nowise be effected by any provisions thereof. "Approved June 24th, 1869."

It seems to me, from a careful examination of this statute, that it intends to clothe with corporate powers the said Dibble and his associates, as purchasers and owners of the roads, and that no further conveyance from them to the corporation into which they were constituted was contemplated. As a corporation they are invested with the rights to hold, operate and enjoy the said railroad, under the name of the Tallahassee Railroad Company; and in the enjoyment thereof, free from molestation, they are to have the benefit of the provisions of the original charter of the Pensacola & Georgia Railroad Company. Instead of a subscription to capital stock, they are authorized to declare the amount of which the stock shall consist, and to divide the same into shares. They are authorized to lease or sell the "said railroad," and to issue coupon bonds and secure the same by mortgage on said railroads, their equipments, franchise, &c. The counsel for the North Carolina Railroad Company supposes that the concluding part of the last section was a notice to any persons dealing with the corporation of the trust deed executed to Swepson. But I do not think that this follows. That deed is not mentioned, and the provision itself is a proper one to prevent the operation of the act in transferring the title to a new personality from affecting the previous conveyances or mortgages, which it might be thought to do. Such previous conveyances or mortgages, however, would stand on their own inherent validity and effect, and would not, if unrecorded, operate to the prejudice of those dealing with the company without notice of them. But the parties did not stop here. Fearing that the title so conferred by the statute might be questioned, a deed of confirmation and release was subsequently executed by Dibble and his associates to the Tallahassee Railroad Company. It is not dated, it is true, except by the year (1870), but that does not interfere with its effect and operation. Having to be executed by a number of parties and their wives, it is probable that the date was left to be inserted when it was completed, and was then overlooked.

I am clearly of opinion that the statute, and this deed of confirmation and release, are sufficient for the protection of all parties dealing with the company, without any knowledge of the trust deed to Swepson.

It is pertinent to remark that the North Carolina Railroad Company, in its original bill, which is sworn to, expressly and without qualification, states that the railroads were duly conveyed to the corporation. The averment is as follows: "That pursuant to said acts of incorporation, or one of them, the said Franklin Dibble and associates, did convey and transfer said Pensacola & Georgia and Tallahassee Railroads according to the terms of said trust agreement, when, and from and after which time, the said Pensacola & Georgia Railroad, and the said Tallahassee Railroad, as separate properties, and the said Tallahassee Railroad Company, as incorporated in the name of said F. Dibble and associates, on the same 24th day of June, 1869, became and now are the railroad owned by the corporation defendant, the said Jacksonville, Pensacola & Mobile Railroad Company, as aforesaid." It is true the complainant has obtained leave to amend its bill, by adding an averment that no such title ever was conveyed to the corporation. Had this positive averment in the original bill been called to the attention of the court, it is doubtful whether the amendment would have been allowed. Standing as it does, however, in the bill, it shows that it was always the understanding of all parties that the title of the roads had been regularly passed to the corporation. The Tallahassee Railroad Company being duly organized according to the plan proposed by the parties, took possession of the railroads and operated or leased them to others. It maintained a separate existence for only eleven months, when it became amalgamated with the Jacksonville & Mobile Railroad Company, as will be mentioned hereafter. It appears that its officers executed bonds to the amount of $1,500,000, which were delivered to Swepson, but were never used, and, if still in existence, have never been regarded as bona fide or valid issues of the company, being superseded by subsequent transactions effected by and through the Jacksonville, Pensocola & Mobile Railroad Company, after the two companies were consolidated. No relief based upon these bonds is sought by any of the parties.

We are next brought to the consolidation of the Tallahassee Railroad Company with the Jacksonville, Pensacola & Mobile Railroad Company. The charter of this company was granted by the legislature of Florida on the 24th day of June, 1869, by an act entitled "An act to perfect the public works of the state." As this act as amended has an important bearing on the questions to be decided in these cases, I will state the substance thereof in some detail. The corporators were Geo. W. Swepson, Milton S. Littlefield, J. P. Sanderson, J. I. Requa and William H. Hunt. The company was authorized to construct a railroad from Quincy, the terminus of the Pensacola & Georgia Railroad, westward to the Alabama line in the direction of Mobile, touching certain specified points, to aid the company in the construction and equipment of its road. By the 9th section of the act, as amended in January, 1870, the governor of the state was directed to deliver to the president thereof, coupon bonds of the state to an amount equal to $16,000 per mile for the whole line of road and length of railroad owned by or belonging to the company, in exchange for first mortgage bonds of said company, when the president should certify upon his oath, that the road, or parts of road, was completed and in good run-

ning order. By the 10th section of the act it was provided that in exchange for the bonds of the state, the president of the company should deliver to the governor coupon bonds of the company, payable to the state of Florida, signed by the president, sealed with the corporate seal, and payable at the same time and place as the state bonds. By the 11th section, as amended by the act of January 28, 1870, a statutory lien was given to the state, valid as a first mortgage, duly registered. on the part of the road, for which the state bonds were delivered, and on all the property of the company appertaining to that part of the line, which it might then have or thereafter acquire, together with the powers and franchises, &c., and on failure of the company to pay either principal or interest for twelve months after due, the governor was empowered to enter and take possession of said property and franchises, sell the same at public auction; and it was directed that all moneys arising from such sale should be promptly and exclusively applied to the payment and satisfaction of the bonds issued by the state, or if the bonds should not be presented, to be invested and held by the state of Florida as trustee for the bondholders, until they should demand the same, and then to be paid to them by the treasurer. By the 14th section of the act it was declared that it should be lawful for the several companies owning the road or parts of roads from Quincy to Jacksonville, from Tallahassee to St. Mark's, and the branch to Monticello, or either of them, by a vote of the owners of a majority of the stock in interest, and with the consent of the owners of a majority of the stock in interest of the Jacksonville, Pensacola & Mobile Railroad Company, to consolidate with the latter company, so as to become one corporation under its name, on such terms as might be agreed on; and after such consolidation the Jacksonville, Pensacola & Mobile Railroad Company were authorized to raise money by way of mortgage, &c., of the railroad and property, franchise and effects acquired by such consolidation, and issue coupon bonds; and to each of said companies was granted the same privileges as those granted to the Jacksonville. Pensacola & Mobile Railroad Company. By the 4th section of the amended act of January, 1870, it was enacted that the governor should for the purpose of aiding the Jacksonville, Pensacola & Mobile Railroad Company, in the speedy construction of its road, deliver to the president of said company coupon bonds of the state to the amount of $16,-000 per mile, upon receiving from the president of the company first mortgage bonds of like amount, on any part of the road between Quincy and Jacksonville, but not for a greater length than 100 miles of any part of railroad between Quincy and Jacksonville: Provided, the said railroad company or companies should not issue first mortgage bonds to a greater amount than $16,000 per mile. Under the 14th section of this act the Talla-

hassee Railroad Company, on the 25th day of May, 1870, was consolidated with the Jacksonville, Pensacola & Mobile Railroad Company, by the unanimous vote of the stockholders of both companies. From the minutes of the stockholders' meeting on this occasion, it appears that Littlefield, who had succeeded to Swepson's interest, held 18,000 shares of the 30,000 of the Tallahassee Railroad Company, and 9,930 of the 10,000 shares of the Jacksonville, Pensacola & Mobile Railroad Company, and that by the consolidation the stock of the two companies was increased to 60,000 shares, of which Littlefield held 38,-433. The consolidated company was duly organized and the road from Quincy to Lake City went into its possession. I have no doubt that the effect of this consolidation was to vest in the consolidated company the property and franchises of both the companies, who were parties thereto.

In my judgment, therefore, the North Carolina Railroad Company must seek for the enforcement of any equities it may have by reason of the misappropriation of its moneys by Swepson and Littlefield, through its right to the interest which they acquired as stockholders in the Jacksonville, Pensacola & Mobile Railroad Company. So far as the public was concerned, Littlefield was the apparent owner of this stock. In dealing with the company the public had a right to regard him as the owner of the stock. The corporation could only act by its officers. The action of those officers, unless known to be fraudulent, bound the company and its stockholders, and all those who claimed any equitable interest in the stock. If the North Carolina Railroad Company knew of the destination which its moneys had taken, and suffered Swepson and Littlefield to retain possession of the stock and control of the Florida corporation, they must abide by their acts as such. It had a remedy in the Florida courts to prevent the continuance of this state of things, and if it did not choose to resort to this remedy it must not call third parties in question for dealing with the corporation as a duly organized body, capable of transacting business.

Under the powers conferred by its charter and the amendments thereto, the Jacksonville, Pensacola & Mobile Railroad Company, in May or June, 1870, issued its bonds to the state of Florida to the amount of $3,000,000, and received therefor the bonds of the state to the same amount, which were delivered to Littlefield, the president of the company, for disposition and sale. Littlefield had already made an agreement with S. W. Hopkins & Co., of New York and London, for the disposal of the said bonds which he expected to receive from the state. This agreement purported to treat for $4,000,000 of state bonds, to be issued to the railroad company, of which $1,000,000 were to be issued by the Florida Central Railroad Company, of which Swepson had the control. Only three days after this arrangement with Hopkins & Co. to dispose of bonds not yet is-

sued, Swepson and Littlefield, whose peculations had now been discovered by the agents of the North Carolina Railroad Company, entered into an arrangement with them, on April 16, 1870, for a participation in the proceeds of the Florida state bonds. This agreement was made at the city of Washington, on the 16th day of April, 1870. It has such an important bearing upon the controversy in this case, that I think it proper to state it in full. It is as follows: "Memorandum of agreement and settlement between the Florida Central Railroad Company, Geo. W. Swepson, president, and the Jacksonville, Pensacola & Mobile Railroad Company, Milton S. Littlefield, president, and Milton S. Littlefield, majority owner of the stock of said companies, and also of the stock of the Tallahassee Railroad Company, of the first part, and the Western Division of the Western North Carolina Railroad Company, represented by N. W. Woodfin, W. G. Candler, W. Pink Welsh and W. W. Rollins, commissioners appointed by an act of the legislature of North Carolina, approved by the stockholders of said corporation, of the second part, witnesseth: That whereas, George W. Swepson, late president of the Western Division of the Western North Carolina Railroad Company, made certain investments of the funds of said company in securities of and interest in the said Florida Central Railroad, Jacksonville, Pensacola & Mobile Railroad, and the Tallahassee Railroad, of the said state of Florida, as per report made by the said George W. Swepson to the said commissioners, amounting in the aggregate to the sum of one million two hundred and eighty-seven thousand four hundred and thirty-six dollars and three cents, to bear interest from the first day of November, 1869, at the rate of eight per cent. per annum. And whereas, the said George W. Swepson, heretofore conveyed to the said Milton S. Littlefield, subject to the payment of the above recited claim, his interest in the above recited railroads; and whereas, the said Littlefield has received authority from the legislature of the state of Florida and the several railroad companies, to receive bonds to be issued by and for account of the several railroad companies, which bonds are to be exchanged for the bonds of the state of Florida, to be issued for the purpose of aiding the finances of the said several railroad companies, all of which bonds are now in a state of preparation. Whereas, the said Milton S. Littlefield, has made a contract with S. W. Hopkins & Co., No. 71 Broadway, for the disposition of said bonds as the same may be issued, the proceeds of the issue of the bonds of the Florida Central Railroad Company of the said state of Florida, amounting to nine hundred and sixty thousand dollars, are to be applied to the payment of the existing liabilities of the said several railroad companies, including the sum of one hundred and fifty thousand dollars to be paid to the commissioners aforesaid for the purpose of paying existing liabilities of the said Western Division of the Western North

Carolina Railroad Company. It is understood and agreed by the parties of the first and second parts, that the proceeds of the sale of the said bonds so to be issued by the said Florida railroad companies and the state of Florida, are to be equally divided, dollar for dollar, between the Western Division of the Western North Carolina Railroad Company and the said Florida railroads, and as the commissioners aforesaid receive by this first sale of bonds only the sum of one hundred and fifty thousand dollars, it is further understood and agreed, that out of the proceeds of the sale of the issue of the bonds of the Jacksonville, Pensacola & Mobile Railroad, there is first to be received by the commissioners aforesaid a sum sufficient to be equal to the amount received by and on account of the said Florida railroads, and then an equal amount is to be received by the said commissioners and the said Florida railroads, dollar for dollar, until the entire amount of one million two hundred and eighty-seven thousand four hundred and thirty-six dollars and three cents, with interest at eight per cent., as aforesaid, being the sum reported by the parties of the first part as due to the Western Division of the Western North Carolina Railroad, is fully paid. It is further understood and agreed by the parties of the first and second parts, that all the interest owned or claimed by the said parties of the first part, George W. Swepson and Milton S. Littlefield, or which they, as individuals, have a right to control in the said Florida railroads, are hereby pledged for the faithful fulfilment of this contract, without the right on the part of any party to interfere with our management or control of the affairs of the road. (Signed) George W. Swepson, President of Florida Central Railroad Co. M. S. Littlefield. M. S. Littlefield, President J., P. and M. Railroad Co. N. W. Woodfin, W. W. Rollins, W. G. Candler, W. P. Welch, Commissioners. Witnesses: M. W. Ransom. R. R. Swepson."

After this agreement, it seems to me impossible to contend that the North Carolina Railroad Company did not accept the situation and acquiesce in the organization of the Florida railroad companies by Swepson & Littlefield, the issue of stock therein to them, and the issue of the bonds in question in this suit. It has been strenuously argued by the counsel of said company that the issue of these bonds was a fraud upon it, and done without its knowledge, and against the interests and will. On the contrary, the fact is plain that the North Carolina Company acquiesced in their issue, and stipulated for a large portion of the proceeds of the sale thereof. If a fraud was committed in the issue of these bonds, it was rather committed on the state of Florida and on the small minority in interest of the other stockholders of the Florida companies; and it is hardly possible to refrain from observing that the North Carolina Company itself was a particeps criminis. What right had that company to make a private stipulation with Swepson and Littlefield, its own officers and agents,

to take to its own use the proceeds of bonds issued by the state of Florida, with the fond, but mistaken expectation that they should be employed in developing its own resources upon its own soil.

It is idle to contend that the North Carolina corporation was not represented in this transaction. The authority of the commissioners appointed by the legislature of North Carolina to act in behalf of the company cannot be questioned. The state was much the largest stockholder, and the legislature had repealed the charter of the company on the 14th of February preceding, and had appointed these commissioners to settle up its affairs. They were the only representatives of the company then existing. Littlefield himself was president of the company at the time of the repeal of its charter, and Rollins and Camden were directors. The commissioners acted in the company's name, and no one can justly challenge their right so to do. Besides, from that time onward, throughout the year 1870, and afterwards, the same commissioners continued to represent the company, as well as the state in many ways, and always in affirmation of the issue of the bonds. Actions were brought and actions defended in the company's name in asserting its claim to the bonds, or the proceeds thereof. One of the commissioners, Col. Woodfin, was sent to London to secure their rights in this regard, and then made another final settlement there with Littlefield, by agreement dated November 10, 1870, on the part and behalf of the Western Division of the Western North Carolina Railroad Company, which agreement, throughout, purported to provide ways and means for carrying out the agreement of April 16, 1870, and securing to the said company the proceeds of the bonds sold and to be sold; amongst other things, providing that an order should be given to said company on S. W. Hopkins & Co., for 800 of the bonds still in their hands, but with the condition that the bonds should be sold by Hopkins & Co. and the proceeds paid to the company. Such order was in fact given and accepted, and £10,000 sterling were subsequently received by the company on account thereof. Calling these settlements conditional settlements, compromises, &c., is a new thought, the result of new light. No such language is used in the original bill. Besides, though they were conditional settlements, or compromises, they were entered into and had the same effect in misleading the public and inducing a sale of the bonds, as if they had had no conditions attached to them. They were not like unaccepted offers of compromise, which, it is true, cannot be used to the prejudice of the party who makes them. They were executed agreements, and show the position which the North Carolina Railroad Company deemed it expedient to assume.

It is useless to go into all the evidence on this subject in detail. The truth is too evident that not only did the North Carolina Company acquiesce in the issue of the bonds, but that they urged and promoted the sale thereof. The principal contest of this company consisted in endeavoring to get the proceeds of the bonds after they were sold, and this contest was continued until the three thousand state bonds issued to the Jacksonville, Pensacola & Mobile Railroad Company, in exchange for its own bonds, had been sold and disposed of. In view of these facts, the North Carolina Railroad Company is to be held as participating in putting out these bonds on the money markets of the world, and it cannot be heard to except to the bona fides of their issue and sale.

Having reached this conclusion, I must hold that the complainants in the case of J. Fred. Schutte, who have produced these very bonds, are bona fide holders, there being not the slightest evidence to the contrary. As such, they are entitled to relief as against the railroad and property of the Jacksonville, Pensacola & Mobile Railroad Company, notwithstanding and prior to any equities the North Carolina Company may be entitled to. The equities of the latter company are to be affected as equitable owners of the stock held by Swepson and Littlefield in the Jacksonville, Pensacola & Mobile Railroad Company, and can rise no higher than the rights of that company itself as against third parties dealing with it in good faith.

The court then proceeded to consider the question whether the holders of the state bonds had, by reason of being such, any lien, legal or equitable, against the railroad and property of the Jacksonville, Pensacola & Mobile Railroad Company.

It has been decided by the supreme court of Florida that the state bonds which these parties hold were created and issued in violation of the constitution of the state, and that they are for that reason absolutely void. But the same court has also decided that the bona fide holders of such bonds are entitled to the benefit of the bonds issued by the Jacksonville, Pensacola & Mobile Railroad Company, in exchange for them, and to have such company bonds and the first mortgage lien created thereby enforced for their protection. In the case of Holland v. State, when this question was involved, the court held that the state of Florida occupied two distinct relations to the holders of the state bonds and to the railroad company,— the first being that of a primary debtor on its own bonds, and mortgage creditor of the company for its indemnity; the second that of a trustee for the holders of the state bonds. "In this relation," says Mr. Justice Westcott (in which the other justices concurred), "the lien created by the statute was for the benefit of the holders of the state bonds. The proceeds of the sale, if he declined to surrender his bonds, were to be invested for him, and he was to have the beneficial interest of a cestui que trust. The

lien of the statute and the company bond, viewed in this light, was for his benefit, and the property and franchises of the company were to be his security for payment. And as the company received his money and the state received nothing, the company was to be held to the obligation of common honesty in the matter of payment and satisfaction." 15 Fla. 534. In the subsequent case of State v. Florida Cent. R. Co., 15 Fla. 723. the court further defines its position on this subject. It then says: "In the case of Holland v. State, we held that while the state bond, as an obligation against the state, as a simple and primary debtor, was void for want of constitutional power in the legislature to authorize such obligation, yet that, under the statute, the state held the bonds of the company and the mortgage lien enuring thereby for the benefit of the holder of the state bonds; that the state, under the statute, was to occupy these two relations, and that while the one failed for want of constitutional power in the legislature to authorize it, the other must be sustained, because the legislature did have the constitutional power to create it, and it was the duty of the court to enforce it. This court did not hold that 'the relation and rights of the state as 'trustees' were the result of any equity springing from the circumstances, independent of the statute, but that its relation as a trustee was a creature of the statute; that, viewed in this light, the lien created by the statute and the company's bond was for the benefit of the bondholders, and the property and franchises of the company were to be his security for payment." The court then proceeds to hold that. under this view, the bondholder is not restricted to the amount paid by him for his bonds, but has all the rights of a "holder" of bonds, including that of recovering the full amount thereof. The same views were again repeated in the recent case of Trustees of Internal Improvement Fund v. Jacksonville, P. & M. R. Co., and also reported in 16 Fla. 719.

A careful examination of the statute leads me to concur in this view of the subject. But the decision of the state court on a question of the construction of a state statute, if not absolutely binding on this court, is, at least, entitled to the very highest consideration and respect, and is to be regarded as of great authority. I feel compelled, therefore, to hold that the holders of the state bonds have a right to the enforcement of the mortgage lien created by the statute by virtue of the bonds of the Jacksonville, Pensacola & Mobile Railroad Company given in exchange therefor. As pertinent to this question, see Young v. Montgomery & E. R. Co. [Case No. 18.166]. The result of this opinion is, that next to the lien for the balance of purchase money due to the trustees of the internal improvement fund, the complainants in the case of J. Fred. Schutte and others are entitled to a mortgage lien upon

the Jacksonville, Pensacola & Mobile Railroad, extending from Lake City to Quincy, and from Tallahassee to St. Mark's, including the branch to Monticello, with all its equipment, property, and. franchises, for the payment of such portion of the bonds held by them, and the interest accrued thereon, as are to be considered as having been exchanged for the bonds of that company, and a first mortgage lien for the payment of the same bonds and interest upon the railroad extending from Quincy to the Chattahoochee river, and its equipment, property, and franchises, reserving, however, for the present, further consideration of the claims of J. W. Gibbes, who has intervened pro interesse suo, in respect to that portion of the line. The said J. Fred. Schutte and others, holders of said state bonds, will also be entitled to a decree dismissing the bill of the Western North Carolina Railroad Company which relates to the Jacksonville. Pensacola & Mobile Railroad.

I will now proceed to the consideration of the case relating to the Florida Central Railroad Company and its property. I have already stated that in this case there is no question about the status of the Western Division of the Western Railroad of North Carolina. Its interest arises altogether from its equitable right to the stock of the Florida Central Railroad Company, and its equities rise no higher than those which belong to the rights of a stockholder. This stock, during the period of the transaction under consideration, was held either by Swepson or Littlefield, or by those to whom they transferred it from time to time, for their own purposes. Parties dealing in good faith with the Florida Central Railroad Company as a corporation have nothing to do with the manipulations of this stock. The main question in this controversy was whether the corporation itself became bound by the bonds which were issued in its name, the amount of which, as before stated, was $1,000.000. The first inquiry naturally was. whether the said company had power to issue such bonds. The act which incorporated the purchasers of the road, passed 29th July, 1868, was in the same general form as that which incorporated the purchasers of the Jacksonville, Pensacola & Mobile Railroad Company, already recited. It did not, however, contain any section corresponding to the sixth section of that act, authorizing the issue of coupon bonds and the securing of the same by mortgage; but it gave the company the general power to grant, sell, mortgage. or dispose of any property acquired for the purposes of the railroad. It will be recollected, however, that the act entitled "An act to perfect the public works of the state," which incorporated the Jacksonville, Pensacola & Mobile Railroad Company by its 14th section. not only authorized the several companies owning the road or roads from Quincy to Jacksonville. &c.. to consolidate with the

Jacksonville, Pensacola & Mobile Railroad Company, but gave to each company the same privileges as were granted to the latter company by the act; and by the 4th section of the amended act, passed January 28, 1870, it was enacted as follows, namely: That the governor shall, for the purpose of further aiding the said Jacksonville, Pensacola & Mobile Railroad Company in the speedy construction of its road, deliver to the president of said company coupon bonds of this state, of the same character as those above described in this act, to the amount of $16,000 per mile, upon receiving for and from the president of said company first mortgage bonds of like amount on any part or portion of the road between Quincy and Jacksonville: provided, however, the state bonds under this section shall not be exchanged for first mortgage bonds for a greater length than 100 miles of any part of railroad between Quincy and Jacksonville, provided the said railroad company or companies shall not issue first mortgage bonds to a greater amount than $16,000 per mile." Now there were only two roads between Quincy and Jacksonville, a part of the road belonging at the time of the passage of this act to the Tallahassee Railroad Company, extending from Quincy to Lake City, and the road of the Florida Central Railroad Company. The act, therefore, must necessarily have referred to these roads and to the companies owning the same. The supreme court of this state so decided in the case of State v. Florida Cent. R. Co., 15 Fla. 704, 705, and held that this section authorized the Florida Central Railroad Company to issue coupon bonds to be exchanged for state bonds by the president of the Jacksonville, Pensacola & Mobile Railroad Company. Taking the two acts together, that of June 24, 1869, and its amendatory act of January 28, 1870, I have no doubt that the Florida Central Railroad Company did have all the requisite powers for issuing such bonds as were issued in this case in the name of said company, and that they might be issued for the purpose of exchanging them for a like amount of state bonds, in aid of the Jacksonville, Pensacola & Mobile Railroad Company. Of course, it would be for the Florida Central Railroad Company to prescribe the condition or consideration on or for which it would issue such bonds. It had the power to do it. If done, and the exchange should be made, and after this the state bonds received by the president of the Jacksonville, Pensacola & Mobile Railroad Company in lieu thereof should be misappropriated by the agents of that company, this would not relieve the Florida Central Railroad Company from its obligations arising upon its bonds to the bona fide holders of the state bonds.

Much stress has been laid in this case upon the fact that the bonds issued in the name of the Florida Central Railroad Company were not regularly executed, but were made and executed in the city of Washington, and signed by George W. Swepson, as president of the company, and by one H. H. Thompson, as treasurer, when the latter was not treasurer, and no authority having been given by the directors for the issue of any such bonds. But, before the bonds were issued, the following action was taken by the board of directors, on the 25th day of May, 1870, to wit: "General Littlefield stated that Mr. Swepson, late president, had appointed H. H. Thompson, Esq., as secretary and treasurer of this company for the past year, and moved that the action of the late president in this respect be approved and confirmed, which was agreed to." A few days later, on the 2d of June, 1870, a meeting of the stockholders was held, representing a very large majority of the stock, when it was unanimously resolved that bonds to the extent of $16,000 per mile be issued by the company, to be a first lien or mortgage on the Florida Central Railroad, its equipments, franchise, &c., and thus reciting that George W. Swepson, the late president, had caused to be prepared bonds to be issued by the company, preparatory to an order of the board of directors to that effect, and which bonds were signed by said Swepson, as president, and countersigned by H. H. Thompson, treasurer. It was therefore unanimously resolved that the said bonds be adopted as the bonds to be issued, and that, when issued, they be a first lien or mortgage on the Florida Central Railroad, its equipment, franchise, &c., except the lots in Jacksonville not used for depot purposes. It was further resolved that the bonds be placed in the hands of Edward Houston, for the purpose agreed upon by an arrangement between himself and Milton S. Littlefield, "who, it was declared, was owner of nearly all the stock in the company," and the bonds, or their proceeds, to be held and applied according to said arrangement, except the proportion thereof applicable or apportionable to the stock owned by other parties; and, upon the satisfaction otherwise of the terms of said arrangement with said Houston, the said bonds were to be by him transferred to Littlefield, or according to his direction, to the extent of the stock owned by him at the time. On the same day the directors adopted the same resolution, and, further, a resolution that the president be authorized to do all acts, and, if necessary, to execute and deliver any proper deed, under the seal of the company, that might be deemed needful to make the first lien or mortgage in favor of the bonds.

In view of these resolutions, all talk about the irregular execution of the bonds, or of the application of the seal thereto, would seem to be irrelevant. It cannot be denied that the bonds were executed and placed in the hands of Littlefield for disposition according to the arrangement between him and Houston. That arrangement, as it stood at this

time, was that there should be placed in Houston's hands, as collateral security for $163,000 due to him from Littlefield, $1,000,-000 of bonds of the state of Florida, to be exchanges for said bonds of the Florida Central Railroad Company. After paying himself, the balance of the proceeds of said bonds was to be distributed and paid as follows, to wit:

| | |
|---|---:|
| To Edward Houston | $163,000 |
| To John P. Sanderson | 57,000 |
| To M. D. Papy | 16,000 |
| To T. Brevard, attorney for holders of Pensacola and Georgia bonds | 50,000 |
| To John P. Sanderson, president of the Florida Central Railroad Company | 340,000 |
| | $626,000 |

—the balance, if any, to Littlefield.

The arrangement further provided that if Littlefield should pay his debt of $163,000 to Houston, the latter should place the bonds in the hands of S. W. Hopkins & Co., to be sold, and the proceeds to be held subject to the other claims, above specified, and the balance to be paid to Littlefield. Houston, in January, 1871, placed the bonds in the hands of T. B. Coddington on substantially the same trusts as he held them. On the 13th of April, 1871, at a stockholders' meeting of the Florida Central Railroad Company, he was authorized to place them in the hands of S. W. Hopkins & Co., subject to the same trusts as to the proceeds thereof.

Now the counsel for the North Carolina Railroad Company and for the Florida Central Railroad Company, contend that the bonds executed by the company, and exchanged for state bonds, were executed for an unlawful purpose, namely, for the purpose of paying private debts or for speculation, and not for the purpose of aiding the Jacksonville, Pensacola & Mobile Railroad Company in the speedy construction of its road, nor for any corporate purpose of the Florida Central Railroad Company itself. Supposing this to be true, how can the corporation itself, or any one claiming under it, raise this objection after having actually executed its bonds and procured the state bonds in exchange therefor, and authorized them to be sold to the public? It seems to me that there is a clear estoppel in the case. It would be to allow the company to perpetrate a fraud upon the public to allow such a defense to prevail. If the stockholders have used the money produced by the state bonds for their own purposes, instead of using it in aid of the Jacksonville, Pensacola & Mobile Company, or for the corporate purposes of their own company, neither they nor the corporation can be permitted to allege their own dishonesty as a reason for avoiding the binding obligation of their bonds. The fact seems to have been that the arrangement for making this issue of bonds had in view a distribution of their proceeds amongst the stockholders in proportion to their several interests. If there was not a fair deal; if some got more than their share,

and others less, they must look to one another for an adjustment of their respective equities. They ought not to be permitted, at this late day, after the state bonds procured in exchange have been sold to purchasers, to plead that their bonds were created for an unlawful purpose. The Florida Central Railroad Company itself is clearly estopped from making such a defense. The North Carolina Company is also estopped, because in the agreements and proceedings which have been referred to, in which it was a party, it acquiesced in the issue of the bonds, and only claimed to share in the proceeds thereof. The agreement of April 16, 1870, before recited, expressly recognized the issue of bonds by the Florida Central Railroad Company, and provided that $150,000 of the proceeds thereof should be paid to the commissioners. And in a supplemental complaint of the said North Carolina Company, filed in August, 1871, in a suit instituted by said company against Sidney W. Hopkins and others in the supreme court of New York, the said company alleged and insisted as follows, to wit: "And the said plaintiffs further show that said S. W. Hopkins & Co. have in their hands, as plaintiffs are informed and believe, a very large amount of the proceeds of the sales of said 4,000 bonds which belong to these plaintiffs, and to other parties interested therein, and that they intend to conceal and fraudulently retain such proceeds to their own use, &c.," and they then invoke the equitable interposition of the court in respect to the proceeds of said bonds. This is but a casual instance of the manner in which the North Carolina Company ever treated the transactions relating to said bonds. Here, it will be observed, the company speaks of the entire issue of 4,000 bonds in one category, thus including those issued in exchange of the Florida Central, as well as others. As late as July, 1873, a consent decree was entered in the case of John Collinson v. S. W. Hopkins and others, in the city of New York, to which the North Carolina Railroad Company was a party, whereby it was provided that $200,000 should be paid to said company out of the proceeds of the bonds which formed the subject of that litigation, being the last 1,200 bonds issued of the 4,000, and including the 1,000 bonds issued in exchange for those of the Florida Central Railroad Company.

It is useless to pursue this subject further, or to examine in detail all the voluminous testimony and documents which have been adduced in relation to it. It is too plain for doubt or question that the North Carolina Company acquiesced as well in the issue of the Florida Central bonds as those of the Jacksonville, Pensacola & Mobile Railroad Company. The truth is, that the agents of the North Carolina Company seem to have been very well satisfied with the issue of the bonds, thinking, by means thereof, to be able to snatch something out of the fire by way of indemnity for the losses sustained by

that company through the malfeasance of Swepson and Littlefield, and I think that said company is concluded from disputing the validity of the bonds as against those who have, in good faith, purchased the state bonds issued in exchange therefor. They may have been unfortunate in their endeavors to get the proceeds of the bonds after they were sold, but that was not the fault of the purchasers, and is no reason for depriving them of their property.

The question then arises, whether the complainant in the suit of J. Fred. Schutte and others are bona fide holders of the bonds, which they produce in this litigation. The possession of the bonds is strong prima facie evidence of just title, and in ordinary cases, throws upon the party questioning it the burden of showing that it is not bona fide, that the holder had notice of some vice or defect which vitiates the title. No such notice is shown in this case. On the contrary, it appears from the evidence of Collinson and Collins that the bonds were sent to Holland to be sold. Collinson says that the bonds were purchased by him of S. W. Hopkins & Co. in London; that they were put on the Dutch market, and were sold there, as he was informed; that the transactions were conducted by Messrs. Boissevain & Milders and Mangay, of Holland, who purchased the bonds from him for the purpose of putting them on the market and selling them. Collins corroborates this testimony, and says that Mr. Woodfin, the agent of the North Carolina Company, whilst in England, did all he could to promote their sale. Dr. Wertheim, who has been present at the hearing of these cases, was examined at the instance of the North Carolina Company after the cases were called, and testified to having been a purchaser of some of the bonds himself in Amsterdam, and to the fact that some of his friends were purchasers at prices which forbid the supposition that they were conscious of anything wrong in the sale of the bonds. He says that he was so stupid as to invest some of his money in these bonds at the rate of 80½ per cent., believing in the good faith of the state of Florida and the managers of the railroads; that he was bitterly deceived, and was unhappy enough to have more of the bonds out of the inheritance of his father; and not himself alone, but a great many widows, orphans, and charity institutions in Holland, purchased them, believing them to be a good and safe investment. In an affidavit made by him in May, 1877, which was exhibited to him by the counsel of the North Carolina Company on the examination, he says distinctly that after examination and such information as could be obtained in Holland, the loan was issued there, and the bonds were bona fide purchased in the market. He says the belief there was that the whole line from Jacksonville to Chattahoochee was consolidated into one line, and that all the bonds had respect to the line as one entirety. This was undoubtedly the impression that was given abroad, and had some foundation in the representations which were made by Littlefield and others.

In my judgment, upon the whole case as presented by the evidence and pleadings, the said bondholders are to be regarded as bona fide purchasers and holders of these bonds, and are entitled, by reason thereof, to a first mortgage lien therefor upon the Florida Central Railroad, so far as any of the bonds held are to be deemed as exchanged for its bonds. This also seems to me to be in accordance with the justice of the case. These parties have parted with their money, relying on the good faith of the state and the companies. It is not their fault that this money did not reach the proper hands. Had it been properly applied, the Florida railroad companies and their stockholders, and those having an interest in the stock, including the North Carolina Railroad Company, would have reaped the benefits. If the money has been squandered or misapplied, it is their misfortune, and should not be visited upon the purchasers of the bonds.

It remains to determine what portion of the bonds raise a lien on the Jacksonville, Pensacola & Mobile Railroad, and what portion a lien on the Florida Central. This branch of the subject is invested with some difficulties. I think it is pretty clear, from the evidence in the case, that the first three thousand state bonds were, in fact, issued in exchange for the bonds of the Jacksonville, Pensacola & Mobile Railroad Company, and that the last one thousand, numbered from three thousand and one to four thousand, respectively, were issued in exchange for the Florida Central Railroad Company's bonds, the latter not being issued until April, 1871, when they were procured by Coddington. It is urged, on the part of the bondholders, that they had no knowledge of this distinction, and ought not to be affected by it. But I am not satisfied that their ignorance on the subject can affect the question. The lien of the bondholders is created by the statute. A resulting equity would have arisen without the aid of the statute, but the statute takes the place of this and regulates the right. Now, the 11th section of the "Act to perfect the public works of the state," passed June 24, 1869, as amended in January, 1870, declares that, "to secure the principal and interest of the said company's bonds, the state of Florida shall, by this act, have a statutory lien, which shall be valid, to all intents and purposes, as a first mortgage duly registered, on the part of the road for which the state bonds were delivered," &c. When, by the 4th section of the amending act, passed in January, 1870, authority was given to issue state bonds in exchange for first mortgage bonds on any portion of the road between Quincy and Jacksonville, it cannot be supposed that such bonds

were to be security for any other state bonds than those which should be given in exchange therefor.

The question is not so much what the bondholders ought to have, as what the statute gives them. If they stood on grounds of mere equity, they might not be able to recover more than the amount paid by them for the bonds. I think, however, that the matter is to be governed by the statutes. I am of opinion, therefore, that the bondholders cannot claim to have a lien on the Florida Central Railroad for any bonds except those whose numbers exceed the number three thousand. Of these, it appears, they hold one hundred and ninety-seven. For these bonds, therefore, and the interest due thereon, they are entitled to a first lien on the said railroad, its equipments, franchise and property. For the remaining bonds held by them, whose numbers are three thousand and under, of which they have produced two thousand seven hundred and forty-nine, they will have a lien, as before expressed, on the Jacksonville, Pensacola & Mobile Railroad.

This disposes of the most important questions in these causes, and a decree will be made in conformity with this opinion, with such qualifications as may be agreed upon by the trustees of the internal improvement fund and the holders of the old first mortgage bonds of the Pensacola & Georgia and Tallahassee Railroad Companies on one part, and the holders of the state bonds on the other, as expressed in the memorandum plan which has been referred to, or otherwise. A decree will also be made for a sale of the several railroads for the purpose of raising the amount due to the respective parties according to the respective liens. The bills of the Western Division of the Western North Carolina Railroad Company will be dismissed, with costs. I have not deemed it necessary to advert to a great deal of the voluminous evidence taken in the cases. The ground taken in the opinion covers all the material points at issue between the parties, and I have stated the conclusions to which I have come from the most careful consideration which I have been able to give to the whole case.

Decree in favor of Holland bondholders against the Jacksonville, Pensacola & Mobile Railroad Company, for $2,751,000, with interest, amounting to $1,655,001.60, and against the Florida Central Railroad Company for $197,000, with interest now matured, $118,515.20, and that railroads of said companies be sold to satisfy.

4 [In addition to the questions above disposed of, the counsel for Daniel P. Holland, James G. Gibbes and various other parties, submitted the questions arising upon interventions for their several interests in relation to the fund arising from the property of the Jacksonville, Pensacola & Mobile Railroad Company. By

the petition of D. P. Holland, it appeared, that on the 2d day of December, 1872, he obtained a judgment in this court against the Jacksonville, Pensacola & Mobile Railroad Company for the sum of $62,533.33, issued an execution thereon, and sold the railroad and its appurtenances, and became the purchaser at such sale, and received a deed from the marshal, and took possession of the road. This sale was afterwards adjudged illegal and was set aside. Holland now claims to have the moneys in the hands of the receiver applied to the payment of this judgment, on the ground that said moneys are the property of the company, being produced by the earnings of the road, and are not subject to the lien of the complainants, or of the trustees of the internal improvement fund.]

BRADLEY, Circuit Justice. 5 [This claim cannot be allowed. The money realized by the receivers is a part of the fund as it stood when the receivers were appointed and put in possession. It is as much a part of the mortgaged premises as are the rails or the cross-ties of the road. It is the product and fruits of the property produced since the court took it in hand for the use of the liens and trusts by which it is bound. The property was taken possession of by the court by its receivers, in order to preserve it for the use of those liens and trusts. The fruits arising therefrom whilst thus in custody of the court, do not belong to the Jacksonville, Pensacola & Mobile Railroad Company in any such sense as to be liable to any other claims than those of the parties for whose protection the road was taken into custody, and such charges as appertain to its management and administration. It would be a strange doctrine to contend, that the Jacksonville, Pensacola & Mobile Railroad Company itself could appear before the court and demand the money in the receiver's hands. And if the company cannot do this, neither can any party whose claim is based as Holland's is, only upon the company's rights.

[The petition urges the statute of January 8, 1853, amending the laws relating to mortgages, which declares that the antiquated claim in favor of the mortgagee to the right of possession of the property specified in the mortgage, by reason of any alleged failure of payment, or breach of promise, or other default, shall in no case be recognized or admitted in a court of justice until all other steps and forms prescribed by law for the foreclosure of mortgages be complied with and observed, and which also declares, that a constructive possession by the mortgagee shall not be allowed to impair the actual, and for ages admitted, right of possession of the mortgagor until deprived thereof by decree, and that the mortgage shall be held a specific lien on the property, and the mortgagee incapable of acquiring possession until after decree of foreclosure.

4 [From 3 Woods, 691.]　　　5 [From 3 Woods, 691.]

This act was evidently intended to abolish the practice which prevailed in England and some of the older states, of allowing the mortgagee to take possession of the mortgaged premises, or to recover the same in ejectment, the moment a default of payment occurred. It cannot apply to prevent the interference of a court of equity in a case where, by the voluntary negligence or misfeasance of the mortgagor, the property is being wasted and consumed so as to peril the security intended by the parties. It cannot apply to prevent such a court from appointing a receiver of a railroad where the railroad company is notoriously insolvent, and is using up and wasting the property. When such a case occurs, as it did in the present case, it is perfectly competent for the court to appoint a receiver to keep and preserve the mortgaged premises, and to enjoin the railroad company from further interfering therewith. And when this is done, it cannot be pretended that the company will be ·entitled to the receipts of the road whilst in the hands of the receivers, further than to be credited with the amount thereof, after deducting expenses. Besides, the present is not the case of a mortgage, so far as the trustees of the improvement fund are concerned; but of a lien for purchase money, which the company or its predecessors, for whose acts it is bound, failed to pay. The continued possession of the property without paying the consideration is a quasi fraud against the vendor, and the purchaser is a trustee for him, and a court of equity is not restrained by anything contained in the statute from appointing a receiver if there is danger of the property being wasted or deteriorated.

[I am of opinion, therefore, that neither the Jacksonville, Pensacola & Mobile Railroad Company, nor any party claiming under it, as Holland does in this case, can demand the moneys which the receivers have realized from the management of the property, until the liens established by this decree have been satisfied. The application of the petitioner is denied.] 6

[From final decrees dismissing the bills of the Western North Carolina Railroad. that company appealed to the supreme court. The decree in each case was affirmed, with costs. 103 U. S. 118.]